UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-cv-00105-TBR

BRANDON R. BRUIN                                                              PLAINTIFF

V.

RANDY WHITE *et al.*                                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the Court are motions for summary judgment and leave to file excess pages by numerous Defendants in this action. [DN 163]. Plaintiff responded. [DN 165]. Defendants replied. [DN 166]. The motions are ripe for adjudication. For the reasons stated below, the motion for leave to file excess pages is **granted**, and the motion for summary judgment is **granted in part and denied in part.**

### I.    Background

Bruin is a convicted prisoner currently incarcerated at Eastern Kentucky Correctional Complex. His claims in this action, however, concern his incarceration at the Kentucky State Penitentiary ("KSP"). Bruin filed a series of complaints, supplemental complaints, and amendments to complaints whereby he raises numerous claims against more than forty defendants. Several of these defendants have been terminated from the action. His claims generally arise from seven separate events: (1) the cutting of his dreadlocks; (2) being assaulted by another inmate; (3) the denial of a "Vegan/Ital" diet; (4) excessive force during a cell extraction; (5) allegedly deficient medical care regarding high blood pressure, headaches, and numbness; (6) claims arising from Plaintiff's fasting and hunger strike; and (7) alleged interference with Plaintiff's access to the courts and medical records.

On initial review [DN 48] of the complaint [DN 1] pursuant to § 1915A, the Court allowed the following claims to continue: (1) Bruin's First Amendment free-exercise and Fourteenth Amendment due-process and equal-protection claims arising out of the May 2016 cutting of his dreadlocks and refusal to allow Bruin to send the cut dreadlocks home against Defendants Charles Crick, Roger Mitchell, James Smith, James R. Beeler, and Randy White in their official capacities for injunctive relief and in their individual capacities for damages and injunctive relief; and (2) Bruin's Eighth Amendment failure-to-protect claim arising out of an assault by another inmate in June 2016 against Defendants Bruce Von Dwingelo, Jill Roberts, and Micah Melton in their individual capacities for damages.

On initial review [DN 97] of Bruin's first wave of amended and supplemental complaints [DNs 20, 23, & 26], the Court allowed the following claims to continue: (1) the First Amendment free-exercise and the Religious Land Use and Institutionalized Persons Act claims regarding denial of a "Vegan/Ital Diet" against Defendants Melton, White, Terry Griffith, and Charles "Aaron" Davis in their official capacities for injunctive relief and in their individual capacities for damages and injunctive relief; (2) the First Amendment free-exercise claim regarding the cutting of dreadlocks against Defendant John Gibbs in his official capacity for injunctive relief and in his individual capacity for damages and injunctive relief and the RLUIPA claim regarding the cutting of dreadlocks against Defendants Charles Crick, Mitchell, James Smith, Beeler, White, Belt, Skyla Grief, Melton, Griffith, and Gibbs in their official capacities for injunctive relief and in their individual capacities for damages and injunctive relief; (3) the Eighth Amendment excessive-force claims regarding the July 30/August 1, 2016 cell extraction against Defendants Jonathan Ruch and Griffith in their individual capacities for damages; and (4) the Eighth Amendment claim of deliberate indifference to a serious medical need regarding Plaintiff's claims of untreated high

2

blood pressure, migraine headaches, loss of vision, tingling in limbs/fingers/toes, and episodes of loss of consciousness against Defendants Davis, Karen Vickery, and Shastine Tangilag in their individual capacities for damages and injunctive relief.

On initial review [DN 112] of Bruin's second wave of amended and supplemental complaints [DNs 34, 54, 57, & 89] this Court allowed the following claims to continue: (1) the First Amendment free-exercise claim regarding the May 2016 cutting of dreadlocks against Defendant Duncan; (2) the various First, Eighth, and Fourteenth Amendment claims and state-law medical negligence claims arising from a "Religious Fast" Plaintiff began on December 14, 2016, which turned into a hunger strike requiring multiple cell extractions for blood work and eventual forced hydration in January 2017 against Defendants White, Ramey, Neely, Raines, Bruce Bauer, Grief, Burkett, Edmonds, Mitchell, James Smith, Michael Alexander, Inglish, Ruch, Corley, Lauren N. Hawkins, Rodriguez, Coombs, Hope, Beeler, and Von Dwingelo; and (3) the Eighth Amendment excessive-force claims against Defendants Swank and DeBoe, the Eighth Amendment failure-to-protect claim against Defendant Grief, the First Amendment free-exercise claim against Defendants Coombs and Rodriguez, and the retaliation claims against Defendants Rodriguez, Coombs, DeBoe, Swank, and Grief. The Court also dismissed Plaintiff's claims for injunctive relief, official capacity claims for damages, and all RLUIPA claims. [DN 112 at 5; 14].

On motion for summary judgment by Defendants Karen (Vickery) Ramey, Kelly Neely, Nancy Raines, Charles Davis, and Bruce Bauer, the Court also dismissed Eighth Amendment and state law claims against them and terminated them as parties. [DN 165]. Currently before the Court is the Motion for Summary Judgment filed by Defendants Michael Alexander, James Beeler, Denise Burkett, Jesse Coombs, James Corley, Charles Crick, Paul Duncan, John Gibbs, Skyla Grief, Lauren Hawkins, Jeffery Hope, Brendan Inglish, Micah Melton, Roger Mitchell, Jill

3

Roberts, Gage Rodriguez, James Smith, Christopher Swank, Bruce Von Dwingelo and Randy White. [DN 163]. These defendants have also filed a motion for leave to file excess pages. *Id.*

## II.     Motion for Leave to Exceed Page Limit

Defendants here have moved to the court for leave to exceed the page limit under Local rule 7.1(d) as regards their memorandum in support of their motion for summary judgment. [DN 163 at 1]. Defendants submit that there are twenty (20) of them, there are multiple claims they must address, and they have a desire to combine their individual motions for summary judgment for expediency. *Id.* The Court finds the parties justified in their need to exceed the page limits. The Plaintiff has not opposed this motion. Thus, the motion to exceed page limits is granted.

## III.    Motion for Summary Judgment Standards

### a.   Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in

the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1177 (6th Cir. 1996).

### b. Exhaustion

The Prison Litigation Reform Act ("PLRA") bars a civil rights action challenging prison conditions until the prisoner exhausts "such administrative remedies as are available." 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). To exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Jones*, 549 U.S. at 218-19. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "[F]ailure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cty. Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 204).

## IV.   Discussion

### a.   First Amendment Claims as to Cutting Bruin's Dreadlocks on May 27, 2016

The Court considers the claims in the order outlined in Defendants' Motion for Summary Judgment. First are Bruin's First Amendment claims against Charles Crick, Roger Mitchell, James Smith, James Beeler, Randy White, John Gibbs, and Paul Duncan stemming from Bruin's

dreadlocks being cut on May 27, 2016. In its first initial review of this action, the Court set forth

Bruin's allegations surrounding the May 27, 2016 cutting of Bruin's dreadlocks as follows:

> Plaintiff alleges that upon transfer to KSP on April 7, 2016, he advised KSP officers that he is a "'proclaimed Rastafarian, and the Locks upon my head were apart of my religious Beliefs.'" He reports that he had a state-court order prohibiting the grooming of his head and that on April 11, 2016, KSP non-Defendant Unit Administrator Shea Carlson "informed me I was permitted to continue my religious practice and if I inherited any problems, to direct my opposers to her." He reports that non-Defendant Carlson also sent an email to "all Unit Supervisors to refrain from grooming" him.

> According to Plaintiff, when KSP officers had wanted to cut his hair, he referred them to the orders and memo prohibiting the cutting of his hair and the officers would manually search his hair for contraband. Plaintiff reports that around April 12, 2016, he asked Defendant Melton to allow him to have a copy of the memorandum permitting him to retain his locks "because I felt uncomfortable with how officers were molesting and using derogatory and Bigotry statements toward my religious practices and Beliefs. Cto; Melton laughed and replied 'Technically by [or] plicy [w] can cut it" (alterations by Plaintiff). Plaintiff reports that he was not provided with a copy of the memorandum.

> As a protection from removal of his hair, Plaintiff states that in early May 2015, he filed a grievance asking KSP "to cease the grooming of proclaimed Rastararians hair, and in addition . . . to have possession of written authorization." On May 16, 2016, Defendant Dan Smith denied Plaintiff's informal grievance, and Plaintiff was permitted to appeal directly to the Commissioner.

> Plaintiff indicates that on May 26, 2016, he was transferred to the "'Super Maximum' housing unit." He alleges that on May 27, 2016, around 7:15 a.m., Defendants Crick, Mitchell, James Smith, and Beeler "approached Plaintiff's door, with a grievance allegedly Plaintiff filed, which allegedly gave authorization by KDOC Commissioner to cut Plaintiff's hair/locks." Plaintiff was ordered to remove the dreadlocks from his head, but Plaintiff advised Defendants that "Manually they (locks) do not come down or out, So their request wasn't feasible because I could not get possession of a comb, razor or clippers." Plaintiff reports telling Defendants about the court order and memo prohibiting the grooming his dreadlocks and indicates that Defendants Beeler and Mitchell left to review the information and to contact Defendant White. Plaintiff alleges that later in the day at around 11:14 a.m.,

>> [D]efendant(s) returned in mask and equiped with football like attire and x26 tasers. Defendant Beeler stated along with defendant Mitchell's Eloquence that defendant, White said "Cut it no excuses." Plaintiff was restrained by the use of force into a restraint chair at which time Plaintiff asked defendant(s) Mitchell, Smith,

> Crick and Beeler: "did the want to Search his head in relation to CPP 9.8 Search Policy. All relevent defendant(s) at this time cut Plaintiff's locks Perfidy to Constitutional rights, Corrections Policy and Procedures and on Honorable Court Order.
>
> Plaintiff states that following the Defendants' cutting of his dreadlocks, he "noticed defendant Beeler possessed the locks in a garbage bag alone" and that when he "requested the locks be sent home to honor the covenant Separation to the lord, Beeler states: 'These contraband around her Boy,' with a sacastic grin, displaying no scruple and volumes of Bigotry and Solecism." Plaintiff reports filing a few grievances following the cutting of his dreadlocks, which Defendant Dan Smith rejected.
>
> Plaintiff alleges several constitutional violations arising out of the cutting of his dreadlocks and failure to send them home, including a violation of the First Amendment Free Exercise Clause and the Fourteenth Amendment Due Process and Equal Protection Clauses.

[DN 48 at 1-3]. Bruin originally made the claims against Defendants Charles Crick, Roger Mitchell, James Smith, James Beeler, and Randy White. *Id.* at 7. After Bruin filed supplemental complaints, the Court allowed Bruin to add Defendants John Gibbs and Paul Duncan as parties to the claim. [DN 97 at 18; DN 112 at 13].

Defendants argue that they are entitled to summary judgment on the First Amendment claims stemming from Bruin's dreadlocks being cut. [DN 163-1 at 7]. In support, Defendants submit that (1) Bruin failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, (2) John Gibbs is entitled to dismissal of the claim as to him because he had no personal involvement in the cutting of Bruin's dreadlocks on May 27, 2016, and (3) even if Bruin had exhausted his administrative remedies, the Defendants are entitled to summary judgment as a matter of law because they are entitled to qualified immunity. *Id.* at 7-15.

As regards Defendants' first argument, the Court finds that Defendants have not established that Bruin failed to exhaust his administrative remedies. Defendants submit that Bruin filed a grievance in an attempt to prevent his dreadlocks from being cut and that he fully exhausted that

grievance. [DN 163-1 at 10]. After Bruin's dreadlocks were cut, he filed further grievances on the issue, but two of those grievances were rejected due to being repetitious of the first grievance attempting to prevent the dreadlocks being cut. [DN 163-6 at 16; 24]. Bruin argues that there was no available administrative remedy to pursue because his grievances on the matter were rejected "for Being Repetitious or just Plain thwarted." [DN 164 at 3]. It is unclear to the Court whether Bruin took further action provided for under the Inmate Grievance Procedures [DN 163-7] or other relevant administrative provisions once his post-cut grievances were rejected for being repetitious. Yet, it is Defendants' burden to establish that Bruin failed to exhaust his administrative remedies. Thus, the Court agrees with Bruin; Defendants have not carried their burden of establishing that Bruin failed to exhaust his administrative remedies on his dreadlocks being cut on May 27, 2016. The Court considers Defendants' failure to carry their burden as establishing that Bruin *did* exhaust his administrative remedies on this issue.

Defendants' second argument is that John Gibbs is entitled to dismissal of the claim as to him because he had no personal involvement in the incident. [DN 163-1 at 11-12]. Bruin alleges in his supplemental complaint, DN 20, that Shift Captain John Gibbs authorized a team to cut Plaintiff's dreadlocks. Defendants submit that Roger Mitchell was the one who authorized James Beeler to use a team to remove Bruin from his cell and remove the dreadlocks. [DN 163-1 at 11-12]. Defendants demonstrate that this is supported by an Extraordinary Occurrence Report ("EOR") [DN 163-4 at 1-4], Roger Mitchell's Affidavit [DN 163-8], and James Beeler's Affidavit [DN 163-9]. Bruin does not respond to this argument. [*See* DN 164]. Accordingly, the Court finds that there is no genuine dispute of material fact as to Gibbs's involvement in the incident, and thus, he will be dismissed as a defendant on this claim.

Last, Defendants argue that even if Bruin did exhaust his administrative remedies, the Defendants are entitled to summary judgment on the claim because they are entitled to qualified immunity. [DN 163-1 at 7-15]. Bruin responds that "Plaintiff knew not the names of the individual who Participated in Such activity, therefore in no way Shall Qualified Immunity Be granted on those grounds alone." [DN 164 at 3-4]. The Court agrees with Defendants that they are entitled to qualified immunity on this claim.

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known." *Heykoop v. Mich. State Police*, No. 19-1688, 2020 WL 7383685, at *3 (6th Cir. Dec. 16, 2020) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). "At the summary-judgment stage, the plaintiff must show both that the defendant official violated a constitutional right and that right was clearly established." *Id.* (citing *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018)). Defendants argue, "[t]here is no clearly established right to be exempt from prison grooming standards under the First Amendment's Free Exercise Clause." [DN 163-1 at 14]. The Court agrees. This Court recently held in *Luther v. White* that "[t]here is no clearly established right to be exempt from prison grooming standards under the First Amendment's Free Exercise Clause." No. 5:17-CV-138-TBR, 2019 WL 511795, at *13 (W.D. Ky. Feb. 8, 2019) (citations omitted). The Court further stated, "[t]ime and time again courts in this circuit, including this one, have upheld prison grooming standards concerning hairstyle in the face of Free Exercise challenges." *Id.* (citations omitted). "At the summary-judgment stage, the plaintiff must show both that the defendant official violated a constitutional right and that right was clearly established." *Heykoop*, 2020 WL 7383685, at *3. Bruin has not carried his burden of establishing

that the officials against whom he brings this First Amendment claim have violated a clearly established constitutional right. Therefore, this claim is dismissed.

### b. Fourteenth Amendment Due Process and Equal Protection Claims as to Cutting Bruin's Dreadlocks on May 27, 2016

Next, the Court considers Bruin's Fourteenth Amendment claims against Defendants Charles Crick, Roger Mitchell, James Smith, James Beeler, Randy White, John Gibbs, and Paul Duncan. Bruin makes out his Fourteenth Amendment claims on the same facts as those outlined in the First Amendment claim above. [*See* DN 1-1 at 7-8].

Defendants argue that even if Bruin had exhausted his administrative remedies, they are entitled to summary judgment on Bruin's Fourteenth Amendment due-process and equal-protection claims stemming the cutting of his dreadlocks on May 27, 2016 because Bruin received due process. [DN 163-1 at 15]. Defendants submit that (1) Bruin was not deprived of due process because he knew about the prison rules prohibiting dreadlocks and was given an opportunity to remove them before they were cut, and (2) there was no differential treatment or discriminatory intent or purpose in cutting Bruin's dreadlocks. *Id.* at 15-17.

Above, the Court determined that Bruin *did* exhaust his administrative remedies. Thus, the Court turns to Defendants' arguments that Bruin was not deprived of due process or equal protection. As regards due process, Defendants argue that "absent some showing that the failure to provide notice of prison rules and regulations caused some injury, as where an inmate is found in violation of a prison regulation because he was not given prior notice that such conduct was prohibited, there is no reason to conclude that the inmate's constitutional rights have been violated." *Id.* at 15-16 (citing *Oakes v. Green*, 2008 WL 559683, at *5, 2008 U.S. Dist. LEXIS 15106 (E.D. Ky. Feb. 27, 2008)). Defendants further argue that because Bruin knew of the hair

regulations and was given a chance to remove the dreadlocks before they were cut on May 27, 2016, Defendants are entitled to summary judgment. *Id.* at 16. Defendants also state that "Bruin's own grievances and narrative in his complaint concerning those grievances reveal that he was aware of the hair regulations before his hair was cut." *Id.*

"Due process has both a substantive and a procedural component." *Golf Village North LLC v. City of Powell, Ohio*, 826 F. App'x 426, 432 (6th Cir. 2020) (quoting *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 933 (6th Cir. 2019)). "The Due Process Clause . . . ensures fair process and safeguards 'a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Schulkers v. Kammer*, 955 F.3d 520, 539 (6th Cir. 2020) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840, (1998)) (internal quotation marks omitted). Here, the Court interprets Bruin's complaint as alleging a procedural, rather than substantive, due process violation. Bruin first states, "On or about May 27, 2016 . . . Defendants . . . along with his freedom to practice Right deprived Plaintiff Personal Property when Defendants Groomed Plaintiffs Locks and Defendants kept Plaintiff from [Ever] having the options to possess those one-hundred and six (106) locks." [DN 1-1 at 11] (brackets in original). Bruin then states, "Policy and Procedures are inplace to [create] liberty interest. An inmates due process rights should be fully protected at all times during confinement." *Id.* (brackets in original). Accordingly, the Court proceeds with a procedural due process analysis.

"In accordance with the Supreme Court's decision in *Wolff v. McDonnell*, prisoners retain rights under the Due Process Clause and cannot be 'deprived of life, liberty, or property without due process of law,' but these rights are 'subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.'" *Bethel v. Jenkins*, No. 19-3392, 2021 WL 728315, at *7 (6th Cir. Feb. 25, 2021) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). The two steps

11

for analyzing a procedural due process claim include: "(1) 'whether there exists a liberty or property interest which has been interfered with by the State' and (2) 'whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). "In order to have a protected property interest, an individual must 'have a legitimate claim of entitlement' to the property interest." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). However, "[p]risoners have narrower liberty and property interests than other citizens as 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Fiorentino v. Williams*, No. 4:20 CV 1893, 2020 WL 7863806, at *1 (N.D. Ohio Dec. 31, 2020) (quoting *Sandin v. Conner*, 515 U.S. 472, 485 (1995)). As to the second step of analysis in a procedural due process claim:

> In determining the necessary procedures under procedural due process, courts consider (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Bethel*, 2021 WL 728315, at *7 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Assuming without deciding that Bruin had a property interest in his dreadlocks, the Court finds that the procedures attendant upon the deprivation of Bruin's dreadlocks were constitutionally sufficient under *Mathews*. Bruin knew that he would be required remove the dreadlocks pursuant to prison policy and filed a grievance attempting to prevent them being cut about two weeks before the date they were cut. [*See* DN 163-6 at 7-12]. Defendants concede that Bruin fully exhausted his administrative remedies on the grievance. [DN 163-1 at 10]. Defendants

explain the process for fully exhausting administrative remedies at the Kentucky State Penitentiary as follows:

> The process for filing a grievance is found in CPP 14.6 Inmate Grievance Procedure. Under CPP 14.6, the grievance process commences with the submission of a written grievance within five (5) days after the incident. [Exhibit 6 at p. 8] This is followed by an attempt to resolve the grievance through informal means. [Id., p. 9] If the inmate is dissatisfied with the outcome of the informal resolution, he may make a written request to the Grievance Coordinator that the Grievance Committee hold a hearing concerning his grievance. [Id., pp. 9 – 10] After the Grievance Committee hears the grievance and makes a recommendation, if the inmate remains dissatisfied with that recommendation, he may appeal to the warden of the facility. [Id., at 12] If the inmate is still not satisfied after the warden's review, he may then appeal to the Commissioner of the KDOC. Id., at 12 – 13] Upon conclusion of the Commissioner's review, the administrative review process is exhausted.

[DN 163-1 at 10, n. 2] (citing DN 163-7). The Court finds this administrative process sufficient to prevent an erroneous deprivation. Further, given "the significant government interest in preventing contraband from entering the prison," *Bethel*, 2021 WL 728315, at *8, even a prisoner's sincerely held desire to keep his dreadlocks on religious grounds may appropriately yield to the government's interest in the safety of its penal institutions. Given these considerations, the Court finds that there is no dispute of material fact as to Bruin's procedural due process claim on cutting his dreadlocks, and Defendants are entitled to summary judgment. The Fourteenth Amendment due process claim concerning Bruin's dreadlocks being cut is, therefore, dismissed.

The Court now turns to Bruin's Fourteenth Amendment Equal Protection claim. In his Complaint, DN 1, Bruin quotes a Kentucky state court judge's order recognizing that Bruin "avers that he is a practitioner of the Rastafarian religion, [and] asserts his constitutionally protected right not to have his hair cut as part of the prison intake process." [*See* DN 1-1 at 11]. In that same complaint, as noted above, Bruin also states, "On or about May 27, 2016 . . . Defendants . . . along with his freedom to practice Right deprived Plaintiff Personal Property when Defendants Groomed Plaintiffs Locks and Defendants kept Plaintiff from [Ever] having the options to possess those one-

13

hundred and six (106) locks." *Id.* (brackets in original). These sentences ground Bruin's equal protection claim.

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Davis v. Detroit Public Schools Community District*, 835 F. App'x 18, 22 (6th Cir. 2020) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty. Ohio*, 430 F.3d 783, 788 (6th Cir. 2005)). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010) (quoting *Scarbrough v. Morgan Cnty. Bd. of Ed.*, 470 F.3d 250, 260 (6th Cir. 2006)). "The 'threshold element of an equal protection claim is disparate treatment.'" *Bonds v. Oldaker*, No: 3:16-CV-00724-JHM, 2019 WL 1028016, at \*4 (W.D. Ky. March 9, 2019).

Defendants argue that Bruin has not established an Equal Protection Clause violation because here, there was no differential treatment, as "[a]ll inmates entering the restrictive housing unit must have their hair, regardless of length, in a free flowing condition so that it can be searched." [DN 163-1 at 17]. Defendants further state that "[r]equiring Bruin to put his hair into a free flowing condition had nothing to do with his observance of Rastifarianism." *Id.* The Court agrees with Defendants. Bruin has failed to show that he was treated differently than any other inmates sufficient to demonstrate disparate treatment because he has not shown that the prison's hair policies are not applied the same to all prisoners. Accordingly, the Court finds that there is no dispute of material fact and Defendants are entitled to summary judgment. The Fourteenth Amendment Equal Protection claim is also dismissed.

### c.  First Amendment and Fourteenth Amendment Claims as to Mailing Bruin's Dreadlocks

Bruin included an allegation in his original complaint that his constitutional rights were violated when he was refused the opportunity to mail his dreadlocks home. [DN 1-1 at 8]; [DN 48 at 3; 7]. Defendants Charles Crick, Roger Mitchell, James Smith, James Beeler, Randy White, John Gibbs, and Paul Duncan argue that even if Bruin had exhausted his administrative remedies, they are entitled to summary judgment on Bruin's First Amendment free-exercise and Fourteenth Amendment due-process and equal-protection claim that he was not allowed to mail the cut dreadlocks out of the prison. *Id.* at 17-18. In support, Defendants submit that (1) Randy White is entitled to qualified immunity, and (2) Bruin failed to meet his burden of demonstrating a clearly established Free Exercise Clause right to mail cut hair out of a penal institution. *Id.*

The Court earlier determined that Bruin exhausted his administrative remedies with respect to his dreadlocks being cut. However, Defendants contend that Bruin did not exhaust his administrative remedies on the issue of having the dreadlocks mailed home. [DN 163-1 at 17] ("The Defendants have found no indication in Bruin's grievance records as set out above that he even raised the matter of mailing the cut dreadlocks home."). The Court agrees with the Defendants. Bruin did not raise this issue in his grievances. Thus, Bruin failed to exhaust available administrative remedies as to mailing his cut dreadlocks out of the prison. Accordingly, the First and Fourteenth Amendment Claims as to mailing the dreadlocks are dismissed.

### d.  First Amendment Claim as to Cutting Bruin's Dreadlocks on July 2, 2017

In Bruin's supplemental complaint, DN 89, Bruin alleges that on July 2, 2017, Defendants Jesse Coombs and Gage Rodriguez "cut Plaintiffs hair for no Reason Besides HATE." [DN 89 at 5]. Bruin argues that this violated the "Freedom to Practice Clause." *Id.* Coombs and Rodriguez

argue that they are entitled to summary judgment on this First Amendment claim. [DN 163-1 at 18]. In support, Defendants submit that Bruin's claim fails as a matter of law for the same reasons his claims related to his dreadlocks being cut on May 27, 2016 fail. *Id.* at 19. Defendants also submit that "[b]ecause there is no clearly established right to exempt from prison grooming standards under the First Amendment's Free Exercise Clause, Coombs and Rodriguez are entitle[d] to qualified immunity." *Id.* The Court determined in subsection (a), above, that Bruin had not established that there was a clearly established First Amendment right to be exempt from prison grooming standards. As such, qualified immunity applies to Coombs and Rodriguez. Accordingly, this claim is dismissed.

### e. Eighth Amendment Failure to Protect Claim Against Von Dwingelo, Roberts, and Melton

Bruin also alleges a failure to protect claim against Defendants Bruce Von Dwingelo, Jill Roberts, and Micah Melton. [DN 1-1 at 12]. Specifically, Bruin alleges that on or about May 26, 2016, he informed Von Dwingelo "of two conflicts that resided at KSP. (inmate Dominique Brock-Butler). No action taken." *Id.* (parentheses in original). Bruin further states, "[o]n or about June 10, 2016 Plaintiff informed Defendant Jill Roberts of the same conflict described above. No action Taken." *Id.* Bruin also alleges that he informed Melton of a conflict with Brock-Butler on June 6, 9, and 13, 2016, at which times Melton responded, "[w]e'll have you brought to the office to discuss the Matter." *Id.* Bruin claims that he got into a physical altercation with Brock-Butler on June 11, 2016 at approximately 8:19 A.M. and sustained "significant head injuries and a [one-inch] laceration to the lip." *Id.* Bruin then states he filed a grievance on the matter on June 13, 2016, but it was rejected for being more than five days from the incident. *Id.* Finally, Bruin states,

"Defendants never took administrative actions even after Plaintiff, on numerous occasions initiated and informed." *Id.*

Defendants argue that they are entitled to judgment as a matter of law. *Id.* at 20. In support, Defendants argue that (1) Bruin failed to exhaust his administrative remedies, (2) Bruin did not suffer physical injury, and (3) Bruin did not inform Von Dwingelo, Roberts, or Melton of the conflict pertinent to his failure-to-protect claim. *Id.* at 20-25.

On the failure to exhaust argument, Defendants recognize that Bruin filed a grievance on the issue but assert that it was rejected because Bruin raised a non-grievable issue. *Id.* at 21. The relevant grievance rejection notice confirms that Bruin's grievance on the issue was rejected for the reasons cited both by Bruin and by Defendants: it was rejected because Bruin raised a non-grievable issue *and* because the grievance was filed more than five days after the incident. [DN 163-6 at 21]. Even if rejecting the grievance on the grounds that it was filed more than five days after the incident was incorrect, it appears that the grievance was properly rejected on the basis that Bruin raised a non-grievable issue.

As Defendants claim, "classification decisions such as documenting conflicts are grievable under Kentucky Department of Corrections, Policies and Procedure (CPP) 18.1 Classification of the Inmate." [DN 163-1 at 21] (citing DN 163-14). Accordingly, to complain that he needed protection because of a conflict with another inmate, Bruin needed to file an appeal pursuant to CPP 18.1. [*See* DN 163-7 at 2; DN 163-14 at 9]. Moreover, although the conflict Bruin complained of was a non-grievable issue under the primary inmate grievance procedures, Bruin still had an administrative remedy available through the "Classification of the Inmate" process. Defendants argue that "Bruin had an administrative remedy available to him . . . [and] to satisfy the PLRA's exhaustion requirement, Bruin was required to exhaust the administrative remedy available to

17

him." [DN 163-1 at 21]. Defendants also submit that "[t]he office of Adult Classifications Branch, which is where the second, and final, review of any appeal Bruin would have filed would have been conducted, has no record of Bruin appealing his classification in connection with being house in contact with Brock-Butler." *Id.* at 22. In sum, Defendants claim Bruin failed to exhaust his administrative remedies on the failure to protect claim against Von Dwingelo, Roberts, and Melton because Bruin did not utilize the available administrative review process.

The Court agrees with Defendants. This Court faced a similar situation in *Haun v. Erwin*, NO. 4:16CV-P43-JHM, 2018 WL 1324160, at *2-4 (W.D. Ky. Mar. 18, 2018). There, the Court determined that the prisoner-plaintiff failed to exhaust his administrative remedies under CPP 18.1(II)(M) where he failed to use that available remedy to address an alleged retaliatory transfer. *Id.* The Court found that Defendants had met their burden of establishing that Plaintiff failed to exhaust administrative remedies when Plaintiff implicitly conceded that he did not avail himself of the available procedure and Plaintiff did not maintain that the procedure was unavailable to him or that Defendants impeded his access to the procedure. *Id.* at 4. The record demonstrates that the same is true of the instant case. Thus, the Court finds that Defendants have established that Bruin failed to exhaust his administrative remedies on his failure to protect claim against Von Dwingelo, Roberts, and Melton. As such, this claim is dismissed.

### f. First Amendment Free Exercise Claims against White and Melton

In his supplemental complaint, DN 23, Bruin claims that he was deprived of his right to free exercise of his religion. [DN 23 at 3-4]. As a "Proclaimed Practitioner of the Rastafarian Religious Chapter" Bruin asserts that he "observes a Vegan/Ital Diet and consumes no animal or animal-by products due to his religious beliefs not to consume anything that symbolized death." *Id.* at 3. Further, Bruin alleges that on April 8, 2016, one day after he arrived at KSP, he "spoke

with Defendant Micah Melton in reference to Plaintiffs' religious diet." *Id.* Bruin says, "Defendant Melton Informed Plaintiff the only available diet at 'KSP' is a 'meat sub' which contains animal by products and animal. Eggs, milk, chees, mayonaise etc." *Id.* Bruin states that he agreed to the "meat sub" option but noticed that "at times the entire tray contained animal-by and or animal products." *Id.* Bruin says that in response, he filed Grievance # 16-05-043-G. *Id.* The grievance specifically complains of being served cheese, eggs, milk and butter, and the grievance does not specifically name any staff members. [DN 163-6 at 3-5]. Bruin says that Defendant Dan Smith— who has already been terminated from this action—responded to Bruin's grievance on May 13, 2016 and instructed him to self-select. [DN 23 at 3-4]. The grievance committee request form responding to the grievance shows that Bruin checked the response option "I am satisfied with the response and do not request a committee hearing." [DN 163-6 at 6]. Bruin further alleges that on June 23, 2016, he contacted Defendant Randy White "via institutional correspondence in regards to Plaintiff receiving a religious diet and respectively requesting Defendant Delegate such request." [DN 23 at 4]. Next, Bruin says that he "re-grieved" the issue to Dan Smith "only to have the grievance rejected by thwart." *Id.* Bruin also claims that on August 22, 2016 Defendant White responded to Bruin "via memorandum with a high volume of rhetoric" and "denied Plaintiff a religious diet." *Id.*

Defendants White and Melton argue that they are entitled to summary judgment on Bruin's First Amendment Free Exercise claims that he was denied a Vegan/Ital Diet. [DN 163-1 at 25.] In support, Defendants submit that (1) Bruin's assertion that he adheres to a vegan diet on religious grounds is not a sincerely held belief, (2) Bruin failed to exhaust his administrative remedies, (3) Bruin's claim against Melton would fail anyway because Melton did not deny Bruin's request but told him that there was a "meat substitute" tray, and (4) Bruin's claim against White would fail

anyway because White informed Bruin that he needed to raise the issue of his dietary restrictions with the Chaplin, and there is no record of him doing so. *Id.* at 26-30.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. "While 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' inmates clearly retain the First Amendment protection to freely exercise their religion." *Johnson v. Thorpe*, No. 4:20-CV-P149-JHM, 2021 WL 203310, at *2 (W.D. Ky. Jan. 20, 2021) (quoting *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987)). "To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own 'scheme of things,' (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief." *Id.* (first quoting *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); then citing *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001); and then citing *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903 at *2, 1997 U.S. App. LEXIS 19963 at *5 (6th Cir. July 30, 1997)).

First, Defendants argue that Bruin's claim that he observes a vegan diet because he is Rastafarian is not a sincerely held religious belief. *Id.* at 26-27. To support this assertion, Defendants state that Bruin filed a grievance in December 2016 in which Bruin claimed he wanted a dairy-free diet, not a Vegan/Ital diet. *Id.* at 26. Further, Defendants argue that Defendant Dan Smith reviewed Bruin's canteen purchases following Bruin's grievance in December 2016 and found that Bruin made canteen purchases including iced honey buns which contained milk, butter, and eggs. *Id.* at 27 (citing DN 163-6 at 38). Smith also stated in his response to Bruin's December 2016 grievance, "I did a random search from canteen purchases from 2015 to present to find you have purchased eggs, honeybuns, ranch dressings, and cheese curls, which appear to me to be dairy products." [DN 163-6 at 38]. Defendants also point to Bruin's Canteen Records, which show

20

purchases including Southern Banquet Chicken, Beef and Bean Burrito, Summer Sausage, Roast Beef Instant Lunch, Jumbo Cheeseburger, Milk, Hot Summer Sausage, and Jack Mackerel Fish. [DN 163-1 at 27] (citing DN 163-6 at 44, 45, 46, 47, 48). In sum, Defendants argue, "Bruin has not adhered to a vegan diet . . . [Bruin's] professed religious beliefs pertaining to a vegan diet are not sincerely held . . . he is only using the issue of a vegan diet on religious grounds as a means to harass the KDOC Defendants." *Id.* at 27. Bruin did not respond to these arguments. [*See* DN 164].

Based on these facts, Defendants challenge the sincerity of Bruin's religious beliefs. "In any free exercise claim, the first question is whether 'the belief or practice asserted is religious in the [plaintiff's] own scheme of things' and is 'sincerely held.'" *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987)). At least one other court in this circuit has recognized that a prisoner's purchase of foods from prison commissaries or canteens that do not adhere to the plaintiff's claimed religious diet may demonstrate that a religious belief is not sincerely held. In *Cook v. Davis*, the court found that the prisoner-plaintiff's consistent purchases of non-kosher items from the commissary, in addition to changing his religion multiple times, demonstrated that the prisoner did not sincerely hold a belief in Judaism. No. 2:18-cv-1421, 2020 WL 3036055, at *3 (S.D. Ohio June 5, 2020). Here, the record demonstrates that Bruin purchased items from the canteen that did not adhere to a Vegan/Ital diet both before and after the time he filed the pertinent grievance. [DN 163-6 at 3-4] (showing that Bruin filed the relevant grievance on May 10, 2016); [DN 163-6 at 40-48] (showing that Bruin purchased foods not within a Vegan/Ital diet throughout 2015 and 2016). Further, it is notable that Bruin did not respond to Defendants' arguments regarding Bruin's purchases of foods that do not adhere to a Vegan/Ital diet. The Court strongly doubts the sincerity of Bruin's beliefs on these grounds.

However, as further discussed below, even if Bruin's Rastafarian beliefs are sincerely held, Defendants White and Melton have not infringed on Bruin's religious beliefs or practices.

White and Melton argue that neither of them denied Bruin a Vegan/Ital diet. [DN 163-1 at 29-30]. Melton asserts that Bruin did not assert a constitutional claim against him because Melton merely "told [Bruin] that there was no meal choice of that kind, but there was a 'meat substitute' tray," and "Melton was powerless to give Bruin a vegan/ital diet plan that did not exist at KSP." *Id.* at 29. Melton further argues that he did not have unilateral authority to order a diet not otherwise available at KSP. *Id.* White argues that he did not deny Bruin his requested diet either. White claims that he "informed Bruin twice, that if he wanted a modification of his diet for religious reasons he need[ed] to raise the issue with the Chaplain pursuant to CPP 11.4." *Id.* White further claims that "whether an inmate is entitled to a modification of his diet for religious reasons is a matter decided by the Chaplin," and "there is nothing of record . . . that [Bruin] addressed his dietary issues with the Chaplin as Warden White advised him." *Id.* at 29-30.

Thus, the Court now considers whether either Melton or White's behavior infringed on Bruin's religious belief or practice. *See Johnson*, 2021 WL 203310, at *2. "A practice will not be considered to infringe on a prisoner's free exercise unless it 'place[s] a substantial burden on the observation of a central religious belief or practice.'" *Id.* at 3 (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)). "[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Id.* (quoting *Living Water Church of God v. Charter Twp. Of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007)). It is difficult to show that a defendant's conduct has created a substantial burden on free religious exercise, and it must make free religious exercise more than just inconvenient, difficult, or expensive. *Id.* (first quoting *Living Water*, 258 F. App'x at 736; and then

quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).

Further, the Sixth Circuit has stated:

> The cases bear out that prison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions. For the inmate, this is essentially a constitutional right not to eat the offending food item. If the prisoner's diet, as modified, is sufficient to sustain the prisoner in good health, no constitutional right has been violated.

*Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002).

Considering the law and the undisputed facts, the Court cannot find that either White or Melton's actions infringed on Bruin's constitutional right to freely exercise his religion. Both Melton and Bruin agree that Melton's only action connected to Bruin's dietary requests was to inform Bruin that there was a meat substitute tray available. [DN 23 at 3; DN 163-1 at 29]. This cannot conceivably demonstrate that Melton placed a substantial burden on Bruin's free exercise right. As to White, Bruin's allegation is that White denied Bruin a religious diet when White responded to Bruin's correspondence about his dietary needs "with a high volume of rhetoric." [DN 23 at 4]. However, as White argues, and as the record reveals, White only informed Bruin that he would need to raise his complaints with the Chaplin pursuant to administrative policy. [DN 163-1 at 29-30; DN 23-1 at 3]. As with Melton's actions, the Court finds that White's informing Bruin of the proper way in which to raise his dietary complaints did not place a substantial burden on Bruin's right to exercise his religious dietary preference. Accordingly, the Court finds that there is no genuine dispute of material fact on Bruin's free exercise claims against White and Melton, and summary judgment is warranted.

Even if summary judgment were not defensible on the grounds that Bruin's religious beliefs are not sincerely held or that White and Melton's actions did not place a substantial burden on Bruin's free exercise of religion, the defendants also argue that Bruin did not exhaust his

administrative remedies on this claim. [DN 163-1 at 28-29]. Defendants argue that the grievance Bruin filed regarding his diet (Grievance 16-05-043-G) itself was not exhausted, nor did it name White or Melton as required by the KDOC Policies and Procedures. *Id.* The Court agrees that these facts illustrate a failure to exhaust. Summary judgment on this claim is appropriate.

> **g. First Amendment Claims Related to Interferences with Communications/Mail Against James Beeler, Bruce Von Dwingelo, Skyla Grief, and Lauren Hawkins**

Defendants James Beeler, Bruce Von Dwingelo, Skyla Grief, and Lauren Hawkins argue that they are entitled to summary judgment on Bruin's five First Amendment claims of "interference with communication with family and mail." *Id.* at 30. The Court addresses each of the claims in turn.

In his supplemental complaint, DN 57, Bruin alleges that "he had [received numerous] mail rejection notices from family and friends indicating Mail was being held in the institution mail-room from date of receipt due to various reasons such as smeared ink, mailing labels, perfume, etc." [DN 57-1 at 11]. Bruin claims that his mail was being destroyed by default disposition because at the time, he was unable to possess personal property, and thus was unable to appeal the rejection notices. *Id.* Further, Bruin states, "[u]nder the First Amendment, Plaintiff has a right to communicate with family and prison officials and can only restrict those privileges in 'a reasonable manner.'" *Id.* On this claim, Defendants argue that Bruin has not specifically stated that his mail was improperly rejected nor has he identified who rejected the mail, and therefore, Bruin failed to state a constitutional claim. [DN 163-1 at 30].

The Court agrees with Defendants that summary judgment is appropriate. Here, Bruin does not claim that his mail was improperly rejected; he states that the mail was being rejected due to "smeared ink, mailing labels, perfume etc.," and he does not claim that those reasons for rejecting

his mail were improper. [DN 57-1 at 11]. "A prisoner's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives." *Price v. Stephenson*, No. 18-1702, 2019 WL 2603540, at *2 (6th Cir. 2019) (quoting *Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir. 2003)). One legitimate penological objective is maintaining "security, good order, or discipline of the institution." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)). The mail at issue here was rejected for established security reasons. Accordingly, Bruin's *first* First Amendment claim related to interference with his communications/mail is dismissed.

In his next First Amendment claim related to mail and communications, Bruin alleges that James Beeler "denied [Bruin] access to [his] legal correspondence from two (2) different agencies when he gave order verbally . . . [that Bruin] was not allowed to have any property." [DN 57-1 at 6]. Bruin claims that he filed a grievance on this issue. *Id.* Beeler claims that he cannot locate the grievance Bruin allegedly filed, and thus, Bruin has failed to exhaust his administrative remedies on this claim. [DN 163-1 at 30]. Beeler also argues that his alleged interference with only two pieces of mail do not rise to the level of a constitutional violation because Bruin only alleges an isolated incident of tampering.

Courts afford greater protections to legal mail that may impact "the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts." *Sallier*, 343 F.3d at 874 (citing *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996)). "However, not all violations regarding legal mail rise to the level of a constitutional violation." *Deuerling v. Claud*, No. 5:15-CV–P33–TBR, 2015 WL 2373175, at *5 (W.D. Ky. May 18, 2015) (collecting cases). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation . . . the inmate must

show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" *Davis v. Goord*, 320 F.3d 346, 351 (6th Cir. 2003) (citations omitted). "[A] random and isolated incident" of failing to receive one's mail "is insufficient to establish a constitutional violation." *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003). Where a plaintiff "does not allege routine opening or interference with his mail . . . [he] fails to state a claim of constitutional proportions." *Bruin v. White*, No. 5:16-cv-P105-GNS, 2017 WL 4322449, at *8 (W.D. Ky. Sep. 28, 2017) (citing *Davis*, 320 F.3d at 351). Even considering that Bruin has alleged two other incidents of interference with his mail, Bruin's claim against Beeler is the only one that raises the issue of *legal* mail, actually claims improper interference, and alleges exhaustion of administrative remedies. Thus, the Court finds this is the only legitimate allegation of mail interference, and therefore, it amounts to a random and isolated incident that does not rise to a constitutional violation. Therefore, the Court grants summary judgment on Bruin's claim against Beeler.

Next, Bruin claims that Defendant Lauren Hawkins denied Plaintiff's receipt of two personal letters because of being on personal property restriction when, at the same time, Bruin received two documents from Defendant Randy White's office. [DN 57-1 at 22]. Bruin states that "Depriving Plaintiff access to Communication with Family and Friends is Guaranteed by Article I of the U.S. Constitution." *Id.* Hawkins claims that summary judgment is due because Bruin failed to exhaust his administrative remedies on the matter, and because she "would not have refused to allow Bruin to have his mail, because she had no authority to do so." [DN 163-1 at 31-32]. Hawkins further explains that inmates can see incoming mail but must surrender it to be held outside of their cells until they come off property restriction. *Id.* at 32.

The Court will grant Hawkins summary judgment on this claim. Though Bruin was apparently on property restriction at the time, he does not allege that he attempted to file a

grievance or seek another available administrative remedy as to the letters allegedly held by Hawkins. Hawkins argues that Bruin failed to exhaust, and Bruin did not reply to that allegation. Further, because Bruin alleges that the mail at issue was mail from his family, the Court doubts that Bruin's allegation of interference rises to the level of a constitutional violation anyway. *See Ayers v. Ohio*, No. 1:18 CV 2890, 2019 WL 4812957, at *4 (N.D. Ohio Oct. 1, 2019) (finding that non-delivery of mail from family and friends, mail related to personal business affairs, and birthday cards did not "rise to the level of a constitutional violation") (citation omitted). Consequently, the Court grants summary judgment on this claim.

Next, Bruin alleges that on separate occasions, Defendant Beeler and Defendant Von Dwingelo terminated phone calls with Bruin's wife and with his mother. [DN 57-1 at 3; DN 57-1 at 13]. Again here, Bruin fails to allege that he filed a grievance as to either call. Von Dwingelo and Beeler contend that Bruin has, therefore, failed to exhaust his administrative remedies. [DN 163-1 at 32]. The Court agrees. Having failed to exhaust his administrative remedies, the Court grants the defendants summary judgment on this claim.

Bruin's final claim related to mail and communications is that Defendant Skyla Grief refused to allow Bruin to correspond with his mother in violation of the First Amendment. [DN 57-1 at 11]. Grief argues that she did not prohibit Bruin from writing to his mother, but he could not write to his mother because he was on property restriction at the time and did not have writing materials. *Id.* at 33. Bruin's inability to send mail to his mother during the time he was on property restriction was reasonably related to a legitimate penological objective of maintaining "security, good order, or discipline of the institution." *Harbin-Bey*, 420 F.3d at 578 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)). Bruin was unable to send mail to his mother for several weeks because he was on property restriction, not for any arbitrary reason. And, again here, the Court

doubts that Bruin's allegation rises to the level of a First Amendment violation. *See Ayers*, 2019 WL 4812957, at *4. Consequently, the Court grants summary judgment on this claim.

### h.   First Amendment Claims Related to First Amendment Free Exercise Right to Fast Against Randy White and Skyla Grief

Bruin's supplemental complaint, DN 57, also sets forth a First Amendment Free Exercise claim arising from a "'Religious Fast'" Bruin began on December 14, 2016, which turned into a hunger strike requiring multiple cell extractions for blood work and eventual forced hydration in January 2017. [DN 57-1]. Bruin says, "Upon Plaintiff being fully hydrated against Plaintiff's will, Plaintiff felt as if Plaintiff's religious fast at that point was interfered with, terminated by default. Plaintiff was abstemious and by fraud, Defendant, White, Grief, Raines; and Neely did everything within and out of their scope of authority to deprive Plaintiff of Plaintiff's right to freely practice Plaintiff's religious scruple." [DN 57-1 at 18]. Raines and Neely have already been terminated as parties to this action; White and Grief are now the only parties to whom this claim applies.

Defendants White and Grief argue that they are entitled to judgment as a matter of law on Bruin's allegation that his First Amendment right of free exercise to fast was violated because (1) Bruin failed to exhaust his administrative remedies and (2) Bruin was not engaged in a religious fast—he was engaged in a hunger strike. [DN 163-1 at 33-49]. Defendants also argue that "Bruin does not have a First Amendment right to starve himself to death." *Id.* at 46. Defendants claim that "force-feeding inmates who voluntarily engage in hunger strikes has been found to be constitutionally permissible where the force-feeding was necessary if, in the prison officials' determination, doing so was necessary because the inmate's life or long-term health was at risk." *Id.* (citing *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)).

Again here, though Bruin was apparently on property restriction at the time, he does not allege that he attempted to file a grievance or seek another available administrative remedy. Nor does Bruin allege there was no available administrative remedy. Defendants assert that Bruin failed to exhaust his administrative remedies because he failed to file a grievance. [DN 163-1 at 47]. The Court agrees but will address the merits as well.

"When a prison policy singles out and substantially burdens a prisoner's sincere beliefs, the First Amendment requires us to ask whether the policy serves a valid penological interest." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d at 455, 460 (6th Cir. 2019) (quoting *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). "If it does not, the inquiry ends, and the prisoner prevails." *Id.* (citations omitted). "But if a regulation serves a penological interest, we must balance (1) whether the prisoner possesses alternative avenues for exercising his religion; (2) whether accommodating the prisoner would affect 'guards and other inmates' or 'the allocation of prison resources generally'; and (3) whether 'obvious, easy alternatives' exist that suggest 'the regulation is not reasonable.'" *Id.* (quoting *Turner*, 482 U.S. at 89-91).

Defendants argue that they had a legitimate penological interest in protecting Bruin's health, and therefore, were justified in requiring hydration. [DN 163-1 at 46-47]. It is beyond doubt that it serves a legitimate penological interest to render medical care to inmates when their health is failing. *See, e.g., Davis v. Agosto*, 89 F. App'x 523, 528 (6th Cir. 2004) ("It was well within the authority of the medical officials at the prison to determine that closing the wound was necessary to the health and safety of Davis as well as to those around him. Had they opted not to provide the treatment, the officials could have subjected themselves to a deliberate-indifference claim and would of course have remained responsible for providing any further medical treatment prompted by the failure to close the wound."). Here, the record demonstrates that medical staff deemed

intravenous fluids "necessary to the essential health of the inmate due to his physical condition at that time." [DN 163-4 at 38]. Further, in balancing considerations of Bruin's alternative avenues for exercising his religion, whether accommodating Bruin would affect guards and other inmates, and whether there were reasonable alternatives to administering medical care, the Court finds that the factors weigh in favor of Defendants. If Grief and White had permitted Bruin's health to continue deteriorating, he might have died, and of course, that would significantly impact guards and other inmates. Furthermore, there is nothing the Court can conceive of that would be an alternative to administering medical care to prevent Bruin's death when he was refusing to eat or drink. The effect that accommodating Bruin would have had on guards and other inmates in addition to a lack of alternatives for administering fluids outweigh the fact that Bruin may have felt he had no other means to exercise his religious rights than to fast. Therefore, the Court finds that Defendants are entitled to summary judgment on this claim.

### i. Various Eighth Amendment Claims

Bruin makes various Eighth Amendment claims in his supplemental complaint, DN 57. The Court addresses the claims in the order Defendants present them.

#### i. Excessive Force Claims

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the unnecessary and wanton infliction of pain." *Rafferty v. Trumbull Cty., Ohio*, 915 F.3d 1087, 1093-94 (6th Cir. 2019) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). "The Supreme Court has explained that '[a]mong unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id.* at 1094 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). "However, '[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition

*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)) (internal quotation marks omitted) (brackets in original).

Further, "[t]o make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component." *Id.* (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). As the Sixth Circuit has explained:

> "The objective component requires the pain inflicted to be 'sufficiently serious.'" . . . As the Supreme Court has stated, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" . . . Rather, the Eighth Amendment protects prisoners only from that conduct which is "repugnant to the conscience of mankind." . . . The objective component of the Eighth Amendment "is a 'contextual' inquiry that is 'responsive to contemporary standards of decency.'" . . . This Court has held that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." . . . Thus, courts should interpret the Eighth Amendment "in a flexible and dynamic manner."
>
> The subjective component requires that the prison official act with a "sufficiently culpable state of mind." . . . This "requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" . . . In some instances, the subjective prong of an Eighth Amendment claim is satisfied by a showing of deliberate indifference, such as in cases concerning medical care, conditions of confinement, or abuse perpetrated by an inmate against another inmate. . . . In other contexts, such as when a prisoner alleges excessive force, the subjective component requires a heightened showing that the prison official acted "maliciously and sadistically for the very purpose of causing harm."

*Id.* (citations omitted).

First, Bruin complains of excessive force in a cell extraction involving Beeler, Inglish, and James Smith. [DN 57-1 at 3]. Bruin alleges that Defendants "requested Plaintiff submit to have his vitals checked. ie Blood Pressure, [temperature], oxygen level, pulse and weight." *Id.* Though Bruin cites this event as occurring on October 26, 2016, Defendants submit that based on the records, they understand that Bruin is referring to a cell extraction that took place on December 26, 2016. [DN 163-1 at 51]. Defendants state that "[t]here is an EOR documenting removal of

Bruin from his cell on December 26, 2016 to facilitate medical staff being able to examine Bruin . . . [a]nd Beeler, Inglish, and James Smith were involved in that cell extraction." *Id.* Defendants further state that "the use of a cell extraction team, and the force used, was necessary because Bruin would not comply with verbal orders." *Id.* at 52. The specific actions Bruin alleges against Beeler, Inglish, and Smith are as follows. First, Bruin says that Beeler emptied an "entire can" of pepper spray/mace "unto the head and neck area of Plaintiff, with Malicious-intent and Motive." [DN 57-1 at 3]. As to Inglish, Bruin claims that Inglish used a "shock-shield" and "greatly forced up against the back area of Plaintiff smashing Plaintiffs person and face into the concrete structure of K.S.P.'s Prison wall . . . and forcefully stepping down on metal ankle restraint chains." *Id.* at 4. As to Smith, Bruin alleges that Smith "forcefully removed Plaintiffs Boxer shorts and exchanged those for a pair of security paper issued trunks." *Id.* at 5. Defendants claim that "there is insufficient evidence against Beeler, Inglish, and James Smith to survive summary judgment." [DN 163-1 at 52]. In support, Defendants argue that a nurse found Bruin suffered no injury, a Senior Captain conducted an administrative review and found the use of force to be compliant with policy, and Bruin did not report any excessive force through administrative procedure. *Id.* at 53. Defendants also contend that they acted in good faith and "used only so much force as was necessary to facilitate medical personnel to examine Bruin in the interest of his health and wellbeing." *Id.* at 54. Finally, Defendants state that Bruin was in restraints and outnumbered, and "if [Defendants] had wanted to hurt Bruin they were more than capable of doing so." *Id.*

None of these allegations satisfy the standard for an Eighth Amendment excessive force claim. None of the actions alleged were without penological justification, because as Defendants argue, and as the record demonstrates, "use of a cell extraction team, and the force used, was necessary because Bruin would not comply with verbal orders." *Id.* at 52; [DN 163-4 at 10-13].

Relatedly, none of the force used here was excessive or repugnant to the conscience of mankind. This is supported by the fact that Bruin does not allege that any of the actions resulted in serious injury or pain. Defendants Beeler, Inglish, and Smith are entitled to summary judgment.

Next, Bruin complains of excessive force in two events involving James Corley. [DN 57-1 at 7-11]. First, Bruin alleges that Corley "applied all of his body weight at [approximately] 240 [pounds] onto shield placed on Plaintiffs body (thighs) and forehead." *Id.* at 7. Separately, Bruin alleges that Corley caused him to fall to the floor and hit his head when Corley was taking Bruin's socks off. *Id.* at 8-9. As to the sock encounter, Corley states that when removing Bruin's property from his cell, "Bruin stiffened his legs to inhibit [Officer] Corley's ability to lift his foot off the floor to remove his sock . . . When Officer Corley lifted Bruin's foot, Bruin feigned an inability to maintain his balance and allowed himself to fall . . . Because Bruin continued to resist, Officer Corley had to cut Bruin's socks off." [DN 163-1 at 55]. Corley also submits that Bruin was charged with a disciplinary action and found guilty by the Adjustment Committee in relation to the incident, and when Bruin filed a grievance on the matter, his grievance was rejected. *Id.* Corley denies that he applied excessive force and claims that Bruin suffered no injury from either event, and that he is entitled to summary judgment on these grounds. *Id.* at 56.

The Court agrees that Corley is entitled to summary judgment on this claim. None of the actions alleged here, nor the amount of force used, were without penological justification. The force used was not repugnant to the conscience of mankind. Although Bruin claims he hit his head, he does not allege serious injury or pain resulted. At the most, Bruin claims he suffered vertigo. [*See* DN 57-1 at 8-9]. These facts do not reveal an Eighth Amendment excessive force violation. Accordingly, Defendant Corley is entitled to summary judgment.

Next, Bruin alleges that when he was secured in the restraint chair to receive hydration, he was "molested and legally violated." [DN 57-1 at 15]. The non-terminated defendants Bruin names include Alexander, Inglish, Rodriguez, Coombs, and Smith. *Id.* Defendants argue that Bruin failed to state a cognizable claim, Coombs was not involved in the incident, Bruin suffered no injury, and no one subjected him to excessive force. [DN 163-1 at 56-57].

Here, the Court finds that Bruin has failed to state a claim upon which relief can be granted, and the claim should be dismissed. "At the summary judgment stage, a district court may dismiss a cause of action if the complaint fails to state a claim upon which relief may be granted." *K.K. by & through J.K. v. Clark Cty. Bd. of Educ.*, 439 F. Supp. 3d 905, 916 (E.D. Ky. 2020) (citing *Meyer v. Natole*, No. 18-1509, 2018 WL 8222903, at *3 (6th Cir. Dec. 10, 2018); *Moore v. Carlton*, 929 F.2d 701 (Table), No. 90-5757, 1991 WL 43906, at *1 (6th Cir. 1991)). In evaluating whether plaintiff has stated a claim, "[w]e need not accept 'a legal conclusion couched as a factual allegation.'" *Courser v. Mich. House of Representatives*, 831 F. App'x 161, 174 (6th Cir. 2020) (quoting *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 246 (6th Cir. 2012)). "Threadbare recitals" will not suffice. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The complaint 'must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory.'" *Id.* (quoting *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). Bruin's bare allegation that he was molested and legally violated is a legal conclusion couched as a factual allegation. The allegation fails to state a claim and therefore, it is dismissed.

Next, Bruin complains of a cell extraction involving Defendant Rodriguez in which Bruin alleges he was "forced into cruel and unusual punishment with excessive force applied." [DN 57-1 at 18]. It is not entirely clear what action Bruin claims included excessive force, but the Court

interprets Bruin to mean that the shield Rodriguez used when Bruin was having his blood drawn was applied too forcefully to his forehead. *Id.* Rodriguez responds that he is entitled to summary judgment because Bruin did not exhaust his administrative remedies on this matter and even if he did, Bruin suffered no injury.

Even if Bruin exhausted his administrative remedies, Rodriguez is entitled to summary judgment on this claim because Bruin fails to show that the force applied to him was excessive or without penological justification or even allege that it resulted in serious injury or pain. Accordingly, the claim is dismissed.

#### ii. *Strip Search Claims*

Bruin next claims that on December 28, 2016, he was strip searched by Defendant Smith several times. [DN 57-1 at 6-7]. Bruin claims that some or all of the strip searches were "voyeuristic." *Id.* Bruin also states that he was "forced to stand in a hallway exposed in the near-nude with shower shoes, see-thru paper boxershorts in full metal restraints, while Officer, Monica McCullough conspicuously observed Plaintiff from her duty post." *Id.* at 7. Smith says Bruin was in fact strip searched several times that day over a short span of time because Bruin moved cell houses and, separately, was taken to the medical room multiple times, necessitating multiple strip searches pursuant to policy. [DN 163-1 at 58-59]. Smith claims that he is entitled to summary judgment because Bruin failed to exhaust administrative remedies, Smith followed procedure in conducting the strip searches, Bruin was not injured, and Bruin does not even allege injury. *Id.*

Smith is entitled to summary judgment because Bruin's claims do not rise to the level of Eighth Amendment violations. The allegations do not involve behavior sufficiently serious to constitute sexual abuse, *see Rafferty*, 915 F.3d at 1095 (collecting cases), and there is no dispute that the strip searches were conducted pursuant to policy. Therefore, this claim is also dismissed.

### iii.   Conditions of Confinement/Deprivation of Medical Care Claim

Bruin alleges in this Eighth Amendment conditions of confinement claim that he was escorted back to a cell on December 26, 2016, and the cell was "excessively covered with mop water used by the inmate janitor service whom were ordered to decontaminate Plaintiffs cell." [DN 57-1 at 5]. Bruin also says that his cell "was fumigated with mace and unspecified cleaning agents." *Id.* Bruin claims that "[s]uch concoctions made it difficult for Plaintiff to breath[e]." *Id.* Bruin also alleges that the toilet in his cell "was constantly leaking the urine and feces of Plaintiff and an institutional [maintenance] report was done." *Id.* Bruin claims that he "continued to complain to the officers conducting security checks on the walk, Plaintiff could not [breathe], yet no officer paid any mind to Plaintiffs request to speak with medical due to not being able to [breathe] and Plaintiffs request to have cell mopped out or Plaintiff relocated in the cell house." *Id.* Defendants argue that these claims must be dismissed on summary judgment because (1) Bruin does not make out the claims against any particular defendant, (2) Bruin did not exhaust his administrative remedies, and (3) Bruin has not made the two showings required by law to establish an Eighth Amendment violation premised on conditions of confinement. [DN 163-1 at 59-61].

"[T]he objective component of a conditions-of-confinement claim is proven where the detainee or prisoner is denied 'the minimal civilized measure of life's necessities.'" *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013) (quoting *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011)). "This includes deprivations of 'adequate food, clothing, shelter, [medical care, and safety].'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (brackets in original). In conditions of confinement cases, "courts look to the evidence presented regarding the duration of exposure and totality of conditions contributing to the alleged deprivation." *Johnson v. Operation Get Down, Inc.*, No. 11–15487, 2014 WL 3752481, at *4 (E.D. Mich. 2014)

(quoting *Eidam v. Bailey*, No. 10–34, 2011 WL 3269625, *3 (W.D. Mich. July 29, 2011)). "[A]llegations about temporary inconveniences do not demonstrate that the conditions [fall below] the minimal civilized measure of life's necessities as measured by a contemporary standard of decency." *Watson v. Charles*, No. 2:10–cv–321, 2011 WL 124649, at *3 (W.D. Mich. Jan 14, 2011) (collecting appellate cases).

Further, "inadvertent failure to provide adequate medical care" does not constitute an Eighth Amendment violation. *Rhinehart v. Scutt*, 894 F.3d 721, 736 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). An alleged deprivation of medical care only offends the Eighth Amendment when there is a serious medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith v. Franklin Cty., Ky.*, 975 F.3d 554, 567 (6th Cir. 2020) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

To the extent Bruin's allegations constitute a conditions of confinement claim, the claim fails because Bruin only alleges that he was subjected to the conditions of mop-water covered floor, a leaky toilet, and irritating fumes for one day at most. This allegation does not satisfy the standard that Bruin was denied a civilized measure of life's necessities sufficient to show he was subjected to cruel and unusual punishment under the Eighth Amendment. To the extent Bruin's allegations constitute a failure to provide medical care claim, again, he complains only that the irritating fumes occurred on one single day, he does not allege any injury resulted, and he does not allege an injury so obvious that even a lay person would call for a doctor. Therefore, this Eighth Amendment claim is dismissed.

### iv.  *Deliberate Indifference Claim*

Bruin also alleges that when he returned to his cell after receiving fluids, he did not have an opportunity to eat dinner and requested food. [DN 57-1 at 18]. Bruin complains that when given

a bologna sandwich, an orange, and orange juice, he "took such offering as a slug of disrespect" because "he is allergic to dairy and doesn't eat meat." *Id.* Bruin also complains that Defendant Lauren Hawkins taunted him with Little Caesar's breadsticks. *Id.* Bruin alleges these actions amount to deliberate indifference as he was deprived "the bare necessities of life." *Id.* Hawkins and Hope argue that Bruin fails to state a claim of deliberate indifference. [DN 163-1 at 61].

The Court agrees with Defendants. Bruin's claims that he was given a bologna sandwich and taunted with breadsticks clearly do not amount to Eighth Amendment violations. Bruin was not deprived of life's necessities by receiving a meal from which he could self-select or by being "taunted" with breadsticks. Accordingly, this claim is dismissed.

### j.  Fourteenth Amendment Due Process Claims

Bruin also makes out numerous claims that his Fourteenth Amendment Due Process rights were violated. [DN 57-1]. First, Bruin alleges that he "was again to live without the bare necessities of life due to being deprived of all state/personal property without just cause or due process void of any form of self harm or thoughts or attempts to hurt others." [DN 57-1 at 9]. Bruin claims it was Defendant Skyla Grief who placed him on property restriction. *Id.* Second, Bruin claims that when he was on property restriction, he could not appeal rejected mail "due to not being allowed to possess personal property." *Id.* at 11. Finally, Bruin alleges a due process claim against Denise Burkett and Randy White for authorizing Bruin to be hydrated against his will during his fast/hunger strike. *Id.* at 15.

"In accordance with the Supreme Court's decision in *Wolff v. McDonnell*, prisoners retain rights under the Due Process Clause and cannot be 'deprived of life, liberty, or property without due process of law,' but these rights are 'subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.'" *Bethel*, 2021 WL 728315, at *7 (citing *Wolff*, 418

U.S. at 556). The two steps for analyzing a procedural due process claim include: "(1) 'whether there exists a liberty or property interest which has been interfered with by the State' and (2) 'whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (quoting *Thompson*, 490 U.S. at 460).

"In order to have a protected property interest, an individual must 'have a legitimate claim of entitlement' to the property interest." *Id.* (quoting *Bd. of Regents*, 408 U.S. at 577). However, "[p]risoners have narrower liberty and property interests than other citizens as 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Fiorentino*, 2020 WL 7863806, at *1 (quoting *Sandin*, 515 U.S. at 485). As to the second step of analysis in a procedural due process claim:

> In determining the necessary procedures under procedural due process, courts consider (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Bethel*, 2021 WL 728315, at *7 (quoting *Mathews*, 424 U.S. at 335 (1976)).

As to the claim that Skyla Grief placed Bruin on property restriction without due process, Grief argues that Bruin was placed on property restriction pursuant to clearly established authority. [DN 163-1 at 63]. In support, Grief cites to CPP 10.2. *Id.* (citing DN 163-28 at 16). Grief also cites to the pertinent grievance documents. *Id.* (citing DN 163-6 at 60-67).

In his original grievance, the action Bruin requests is "that individuals receive some level of due process when being placed on property restriction because . . . administrative staff deprive inmates of Constitutional Rights when not allowing them to receive their property when being

placed on alleged behavioral watches void of Being Suicidal." [DN 163-6 at 61]. Bruin also states in his Appeal Grievance Form that the Department of Corrections Policy on hunger strikes—CPP 13.14—"[d]oes not promulgate the seizure of my property." *Id.* at 63. Warden Randy White and the Commissioner each wrote memos during the appeal process on Bruin's grievance. White wrote in his memo, "Bruin was placed on property restriction upon evaluation by a mental health professional in accordance with the Hunger Strike Protocol due to his behavior of self-harm." *Id.* at 65. The Commissioner wrote to Bruin, stating, "you were placed on Hunger strike watch due to your refusal to consume meals . . . you were placed on property restriction due to your behavior of self-harm." *Id.* at 67.

First, the Court interprets Bruin as alleging deprivation of a liberty interest rather than a property interest. See *Bd. of Regents*, 408 U.S. at 571-78 (describing and distinguishing between liberty interests and property interests). Bruin does not claim any property interest created by state law or any other source independent of the Constitution. *Bethel*, 2021 WL 728315, at *7 ("[P]roperty interests 'are not created by the Constitution;' rather, they are established by 'an independent source such as state law.'") (quoting *Bd. of Regents*, 408 U.S. at 577). Further, Bruin's complaint that a due process interest was implicated in being placed on property restriction resembles the claims in cases addressing alleged deprivations of liberty interests in segregated confinement. *See, e.g., Graham v. Chicowski*, No. 18-2049, 2019 WL 4381841, at *4-5 (6th Cir. May 3, 2019); *Joseph v. Curtin*, 410 F. App'x 865, 867-68 (6th Cir. 2010); *Daugherty v. White*, No. 5:17-CV-P141-TBR, 2017 WL 5969156, at *2-3 (W.D. Ky. Nov. 30, 2017). However, because Bruin does not allege the deprivation of a liberty interest protected by the Constitution, his due process claim here fails. As this Court stated in *Daugherty*, "the Fourteenth Amendment does not protect every change in the conditions of confinement having an impact on a prisoner."

2017 WL 5969156, at *3. To the contrary, a Fourteenth Amendment liberty interest is only violated "when a deprivation 'will inevitably affect the duration of his sentence' or imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin*, 515 U.S. at 486-87. In *Daugherty*, this Court held that a 63-day lockdown was not an atypical and significant hardship. *Id.* at *2-3 (collecting cases). Moreover, "[c]onfinement is considered atypical and significant only in 'extreme circumstances.'" *Hamilton v. Roederer Corr. Complex*, No. 3:20-cv-P160-DJH, 2020 WL 4587524, at *3 (W.D. Ky. Aug. 10, 2020) (citations omitted). "Generally, courts consider the nature and duration of a stay in segregation to determine whether it imposes an 'atypical and significant hardship.'" *Duncan v. Embree*, No. 3:19-CV-P890-RGJ, 2020 WL 948084, at *3 (W.D. Ky. Feb. 26, 2020). Bruin's claim that he was placed on property restriction due to self-harm risk for what the Court understands to be about one month[1] does not amount to an atypical and significant hardship in the context of prison life, and therefore, does not implicate to a Fourteenth Amendment liberty interest. Accordingly, Bruin's claim here fails on the first prong of the procedural due process analysis. This claim is dismissed.

As to the claim that Bruin could not appeal mail that was being rejected [DN 57-1 at 11], Defendants argue the claim should be dismissed because (1) it is unclear against whom Bruin makes the allegation and (2) to the extent Bruin alleges that he could not appeal the intercept of his mail, Bruin filed a grievance on this matter. *Id.* at 63-64. The Court addressed Bruin's First Amendment claims related to mail in subsection (g), above.[2] Here, however, Bruin claims a Fourteenth Amendment due process violation in his inability to appeal rejected mail during the

---

[1] In his supplemental complaint, Bruin says the "property stripout was authorized by Defendant, Skyla Grief on 1/4/2017." [DN 57-1 at 9]. The last date on which Bruin complains of not receiving mail is February 3, 2017. *Id.* at 22. A medical note shows that a nurse recommended Bruin be taken off hunger strike watch on February 8, 2017. [DN 163-13 at 69-70; DN 163-1 at 46].
[2] *See infra* Section VI(g), pp. 27-31.

time he was on property restriction. [DN 57-1 at 11]. "Courts, however, have repeatedly held that there exists no constitutionally protected right to effective prison grievance procedure." *Branham v. Jordan*, No. 3:20-CV-P567-CHB, 2021 WL 682076, at *3 (W.D. Ky. Feb. 22, 2021) (citing *Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569-70 (6th Cir. 2002)); *see also Anderson v. Shelby Cty. Gov't*, No. 11–2024–STA–dkv, 2012 WL 566934, at *10 (W.D. Tenn. Feb. 21, 2012). Because Bruin has no constitutionally protected right in the grievance or appeals processes, this claim is also dismissed.

As to the claim that Denise Burkett and Randy White authorized Bruin's hydration against his wishes in violation of Fourteenth Amendment due process, Defendants claim (1) Bruin was not engaged in a religious fast, and (2) White had no personal involvement in making the medical decision to administer fluids. *Id.* at 64-65. However, the Court has already determined in this case that the facts of Bruin's forced hydration do not give rise to a constitutionally cognizable claim under the Fourteenth Amendment:

> These facts also do not give rise to a constitutionally cognizable claim under the Fourteenth Amendment. In *Davis v. Agosto*, the Court adopted an Eighth Circuit Opinion rejecting a constitutional challenge to a decision by prison officials to force-feed an inmate after a hunger strike. 89 Fed. App'x. 523, 528 (6th Cir. 2004). "While '[t]he Supreme Court has held that individuals in state custody enjoy [a] protectable liberty interest[ ] ... to refuse medical treatment.' *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir.1996), that right is not absolute and is particularly susceptible to regulation in the prison setting." *Id*. The Court further stated, "[h]ad [the officials] opted not to provide the treatment, the officials could have subjected themselves to a deliberate-indifference claim and would of course have remained responsible for providing any further medical treatment". *Id*. Here, Defendants only acted when necessary. Had they not hydrated Bruin, they may have acted with deliberate indifference. Therefore, the claim against them must be dismissed.

[DN 165 at 14-15]. The same law applies to Bruin's Fourteenth Amendment claim against White and Burkett. White and Burkett are also granted summary judgment on this claim, and therefore, it is dismissed.

### k.  Eighth Amendment Excessive Force Claim Against Christopher Swank

In his supplemental complaint, DN 89, Bruin alleges that "Plaintiff was Met at [his cell] Door entry By Defendant, Swank and Defendant Swank Physically Punched Plaintiff with a closed fist in the Mouth and cheek region of the face causing swelling, ¼ inch laceration and Bleeding." [DN 89 at 4] (citing "Exhibit #1; Medical Note"). Bruin asserts, "excessive, Malicious Force is stated as a legal Claim." *Id.* Swank argues that he is entitled to summary judgment on Bruin's claim that Swank punched him in the mouth in violation of the Eighth Amendment because (1) Bruin grieved the allegation and the investigation revealed no evidence that Bruin was assaulted, (2) Swank denied that he punched Bruin, (3) the "medical note" Bruin attached to Supplemental Complaint, DN 89, does not document any injury to his mouth, and the document shows that Bruin refused medical treatment because he wanted Internal Affairs to document the swelling from the punch, but Bruin attached no such documentation from Internal Affairs, and (4) the fact that Bruin refused medical treatment shows that he had no injury to treat. [DN 163-1 at 65-66].

Although Bruin filed a grievance on this issue and appears to have fully exhausted it, the Commissioner ultimately wrote Bruin in a memo: "As stated at all levels of the grievance, your allegations that staff assaulted you were investigated and no evidence was found to support your contentions. Staff were interviewed and video footage was reviewed and no evidence was found for any assault." [DN 163-6 at 34]. The medical exhibit that Bruin filed on the matter is listed as a telephone encounter and states, "inmate complained of lip pain stating he was punched in face,

upper right lip was swollen inmate refused any treatment stating 'i want the swelling to stay till IA can document this.'" [DN 89-1 at 1].

On this claim, the court denies summary judgment. There is a material factual dispute over whether Swank punched Bruin. Even if Bruin's injury was only a swollen and cut lip, "'[i]n the excessive force context, the focus is on the extent of force used rather than the extent of the injuries, although the two are at least imperfectly correlated." *Roberts v. Coffee Cty., Tenn.*, 826 F. App'x 549, 556 (6th Cir. 2020) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010)). Without evidence to the contrary, the Court assumes that Swank acted without penological justification in punching Bruin, and that he acted with a culpable state of mind. Even if Bruin's claim is without merit, Swank has not made a showing sufficient for the Court to grant summary judgment.

### l.   Eighth Amendment Failure to Protect Claim Against Skyla Grief

Bruin alleges an Eighth Amendment failure to protect claim against Defendant Skyla Grief. [DN 89 at 4-5]. Bruin claims that Grief failed to protect him from another inmate (Brock-Butler) by locating him on a different cell block from Brock-Butler when Grief knew that Bruin had already had a conflict with Brock-Butler. *Id.* Bruin claims that as a result, Brock-Butler pushed Bruin down "5 to 7 steps . . . while in route to Outside Recreation." *Id.* at 4. Bruin claims this happened while he was "fully restrained in Metal wrist and ankle restraints." *Id.* Further, Bruin claims that in 2016, he filed a conflict on Brock-Butler with Defendant Micah Melton who "allegedly submitted this Complaint to Defendant, Grief for Processing." *Id*. at 4-5.

Grief argues that she is entitled to summary judgment on Bruin's Eighth Amendment failure-to-protect claim. *Id.* at 66. In support, Grief submits that (1) Bruin failed to exhaust his administrative remedies, (2) Bruin's allegation that he was fully restrained and yet another inmate was able to come into contact with him is belied by common sense, and (3) Deputy Warden Grief

could not have been deliberately indifferent to Bruin's safety because Bruin never informed anyone of a conflict between him and the inmate who allegedly harmed him. *Id.*

The Court already determined that Bruin failed to exhaust administrative remedies as to his conflict with Brock-Butler above.[3] Accordingly, summary judgment is appropriate for failure to exhaust under the PLRA. However, even if Bruin had exhausted his administrative remedies, his claim would fail on the merits.

"For a failure-to-protect claim to lie against a prison official, the plaintiff must show that: (1) 'objectively,' he was 'incarcerated under conditions posing a substantial risk of serious harm,' and (2) the official acted with 'deliberate indifference' to inmate safety, meaning the official was 'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it.'" *Reedy v. West*, No. 20-1367, 2021 WL 710909, at *3 (6th Cir. Feb. 24, 2021) (citing *Farmer*, 511 U.S. at 829, 834, 847; *Beck v. Hamblen Cty.*, 969 F.3d 592, 598 (6th Cir. 2020)) (internal citations omitted). On the objective prong, Bruin's unsubstantiated allegation that he was in one single altercation with Brock-Butler does not show that he was incarcerated under conditions posing a risk of serious harm. *See id.* at *6. Further, Bruin cannot demonstrate that Grief was aware of any risk to him and failed to take reasonable measures to abate it, especially where he failed to avail himself of available administrative remedies that would have put her or other prison officials on notice. "An official is deliberately indifferent if he or she knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at *5 (quoting *Bishop v. Hackel*, 636 F.3d 757, 761-62, 766 (6th Cir. 2011) (internal quotation marks omitted). Bruin has not alleged sufficient facts that show he can satisfy the legal standard for an

---

[3] *See infra* Section VI(e), pp. 19-21.

Eighth Amendment failure-to-protect claim against Grief. Accordingly, Grief is entitled to summary judgment on this claim.

### m. First Amendment Retaliation Claims Against Rodriguez, Coombs, Swank, and Grief

In his supplemental complaint, DN 87, Bruin concludes the complaint by stating: "In addition all these acts are reprisal and retaliation for the filing of Plaintiffs Original Complaint, and is Done to Deter Plaintiff in any way." [DN 89 at 5]. Defendants Gage Rodriguez, Jesse Coombs, Christopher Swank, and Skyla Grief argue they are entitled to summary judgment because they could not have retaliated against Bruin for filing the lawsuit, as he alleges, because none of them were aware of the suit until March 2019, and Bruin filed the claim at issue here in his supplemental complaint, DN 89, in 2017. [DN 163-1 at 68-69]. Defendants also claim that "there mere allegation of unlawful retaliation by corrections employees, without more, is insufficient as a matter of law to state a cognizable claim of retaliation . . . [s]uch conclusory pleading does not even satisfy the minimum pleading requirements . . this remains true even with the addition latitude afforded pro se litigants." *Id.* at 67.

The Court agrees that Bruin has failed to state a claim. "At the summary judgment stage, a district court may dismiss a cause of action if the complaint fails to state a claim upon which relief may be granted." *Clark Cty. Bd. of Educ.*, 439 F. Supp. 3d at 916 (citations omitted). In evaluating whether plaintiff has stated a claim, "[w]e need not accept 'a legal conclusion couched as a factual allegation.'" *Courser*, 831 F. App'x at 174 (citations omitted). "Threadbare recitals" will not suffice. *Id.* (quoting *Iqbal*, 556 U.S. at 678). "The complaint 'must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable

legal theory.'" *Id.* (quoting *LULAC*, 500 F.3d at 527). Bruin's conclusory allegation that Defendants have retaliated against him fails to state a claim. It is dismissed.

## V.   Conclusion

Defendants' Motion for Leave to File Excess Pages [DN 163] is **GRANTED**. Defendants' Motion for Summary Judgment [DN 163] is **GRANTED IN PART** and **DENIED IN PART**. The following claims are **DISMISSED** from this action **WITH PREJUDICE**:

1. First Amendment Claims [DN 1; DN 97; DN 112] as to Cutting Bruin's Dreadlocks on May 27, 2016 against Crick, Mitchell, Smith, James Beeler, White, Gibbs, and Duncan

2. Fourteenth Amendment Due Process and Equal Protection Claims [DN 1; DN 97; DN 112] as to Cutting Bruin's Dreadlocks on May 27, 2016 against Crick, Mitchell, Smith, James Beeler, White, Gibbs, and Duncan

3. First Amendment and Fourteenth Amendment Claims [DN 1; DN 48; DN 97; DN 112] as to Mailing Bruin's Dreadlocks against Crick, Mitchell, Smith, James Beeler, White, Gibbs, and Duncan

4. First Amendment Claim [DN 89] as to Cutting Bruin's Dreadlocks on July 2, 2017 against Coombs and Rodriguez

5. Eighth Amendment Failure to Protect Claim [DN 1] Against Von Dwingelo, Roberts, and Melton

6. First Amendment Free Exercise Claims [DN 23] against White and Melton

7. First Amendment Claims Related to Interferences with Communications/Mail [DN 57] against James Beeler, Von Dwingelo, Grief, and Hawkins

8. First Amendment Claims Related to First Amendment Free Exercise Right to Fast [DN 57] against White and Grief

9. Eighth Amendment Claims [DN 57] against James Beeler, Inglish, Smith, Corley, Alexander, Rodriguez, Coombs, Hawkins, and Hope

10. Fourteenth Amendment Due Process Claims [DN 57] against Grief, Burkett, and White

11. Eighth Amendment Failure-to-Protect Claim [DN 89] against Grief

12. First Amendment Retaliation Claims [DN 89] against Rodriguez, Coombs, Swank, Grief

The following claim will go forward:

1. Eighth Amendment Excessive Force Claim Against Christopher Swank [DN 89] (pages 43-44 herein)

The following defendants are **TERMINATED** as parties, and **the Clerk is DIRECTED to terminate these parties from the docket sheet:**

Michael Alexander,

James Beeler,

Denise Burkett,

Jesse Coombs,

James Corley,

Charles Crick,

Paul Duncan,

John Gibbs,

Skyla Grief,

Lauren Hawkins,

Jeffery Hope,

Brendan Inglish,

Micah Melton,

Roger Mitchell,

Jill Robertson,

Gage Rodriguez,

James Smith,

Bruce Von Dwingelo, and

Randy White.

**IT IS SO ORDERED**.

**Thomas B. Russell, Senior Judge**
**United States District Court**

March 12, 2021

cc: counsel

**Brandon R. Bruin**
240651
EASTERN KENTUCKY CORRECTIONAL COMPLEX
200 Road to Justice
West Liberty, KY 41472
PRO SE