## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

**BRANDON R. BRUIN**                                                                                       **PLAINTIFF**

**v.**                                                                                              **NO. 5:16-CV-105-BJB**

**CHRISTOPHER SWANK**                                                                                   **DEFENDANT**

\*\*\*\*\*

### FINDINGS OF FACT & CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

In this long-running case, *pro se* plaintiff Brandon Bruin has claimed that numerous supervisory officials and prison guards in the Kentucky Department of Corrections have violated several of his constitutional rights. At this point though, only one claim remains: whether officer Christopher Swank violated Bruin's Eighth Amendment rights by gratuitously punching him in the face in October 2016. The Court held a one-day bench trial to resolve this claim. This opinion contains the Court's findings of fact and conclusions of law. The Court holds that Bruin has not established by a preponderance of the evidence that Swank punched him, and therefore cannot prevail on his Eighth Amendment claim.

### THIS DISPUTE

This lawsuit began in July 2016 when Bruin—who at the time was incarcerated at the Kentucky State Penitentiary—filed a complaint against the Penitentiary's warden, several supervisors, and various individual officers. Bruin alleged that he was "a proclaimed Rastafarian, and the [dread]locks on his head were a part of [his] religious beliefs." Complaint (DN 1-1) ¶ 10. The Defendants, he claimed, forcibly cut his dreadlocks and refused to allow him to mail the clippings home. ¶¶ 26–27. Bruin also alleged that several guards failed to protect him from another prisoner. ¶¶ 41–46. According to Bruin, these actions violated his religious beliefs and due-process rights. *See* ¶¶ 37–40.

During the next thirteen months, Bruin filed multiple supplemental and amended complaints adding additional claims and defendants. *See* DNs 18, 20, 23, 26, 34, 54, 57 & 89. Most relevant to this opinion is the "Supplemented Complaint" filed in August 2017. DN 89. That pleading alleged, among other things, that while Bruin was "in full metal wrists and ankle restraints," newly named defendant Christopher Swank "physically punched Plaintiff with a closed fist in the mouth and cheek region of face causing swelling, ¼ inch laceration, and bleeding." *Id.* at 4. This, Bruin asserted, constituted "excessive [and] malicious force" that violated his right to remain free of cruel and unusual punishment. *Id.* To remedy this purported Eighth Amendment violation, Bruin sought $1.00 in "money damages," $100,000 in punitive damages, and "any relief the Cour[t] deem[s] just and proper." *Id.* at 6.

1

Multiple judges have presided over this long-running case. Two separately dismissed several of Bruin's claims before his complaint was ever served on the Defendants. *See* Screening Opinions (DNs 48, 97, 112); 28 U.S.C. § 1915A ("The court shall review … a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer …. On review, the Court shall … dismiss … any portion of the complaint [that] is frivolous, malicious, or fails to state a claim …."). Those that survived screening—including Bruin's claim against Swank—proceeded to discovery and dispositive motions. In March 2021, the district judge granted summary judgment to the Defendants on all of Bruin's claims except one—the excessive-force claim against Swank. First Summary Judgment Opinion (DN 165) at 16; Second Summary Judgment Opinion (DN 169) at 47–48. That claim survived summary judgment because of "a material factual dispute over whether Swank punched Bruin," with "the Court assum[ing] that Swank acted without penological justification in punching Bruin, and that he acted with a culpable state of mind." Second Summary Judgment Opinion at 44. Swank moved for reconsideration of that decision, DN 171, but the Court denied his motion because Swank failed "to carry his burden of production to prevail on summary judgment," Reconsideration Opinion (DN 181) at 4.

The district judge set the claim against Swank for trial in July 2022, Scheduling Order (DN 205) at 1, but later vacated that trial date because "[t]he facility that plaintiff Brandon R. Bruin is housed in … is on lockdown due to Covid-19," Order Vacating Trial (DN 222) at 1.

The Chief Judge reassigned the case in May 2023. DNs 226, 227. At a telephonic hearing, the parties agreed to delay proceedings until Bruin's release from prison in March 2024. Order Setting Telephonic Pretrial Conference (DN 234) at 1. During that conference, Bruin stated that he would walk away from the suit and not go to trial if the defense settled for $1,300. *Id.* But Swank (represented but not indemnified by the Department), through counsel, reported that he was unwilling to pay out of pocket to settle this case and that the Department of Corrections had not authorized the payment of any settlement, no matter the strike value, on his behalf. *Id.* Without objection, the Court scheduled this case for a bench trial and appointed elbow counsel to assist Bruin. Trial & Pretrial Scheduling Order (DN 239) at 1; Order Appointing Elbow Counsel (DN 241) at 1.[1] The Court held a one-day bench trial on July 16, 2024.

---

[1] The Court appointed David Riley, an attorney with the law firm of Grumley, Riley & Stewart in Paducah, to serve as elbow counsel. Order Appointing Elbow Counsel at 1. Mr. Riley skillfully discharged his duties, and the Court thanks him for his *pro bono* service.

2

## THE EVIDENCE

Bruin and Swank agree on the events leading up to the incident in question. On October 26 or 27, 2016,[2] Officers Swank and Gardner were returning Bruin to his cell after Bruin had been brought to the visitation area and ordered to comb out his dreadlocks. Trial Tr. (DN 255) at 30:8–33:5; 88:22–25; 114:19–115:10. Bruin was shackled and handcuffed. *Id.* at 34:13–16; 114:23–25. Swank was standing next to him, while Gardner was "four or five feet" away. *Id.* at 33:16. When his cell door opened, Bruin walked to the desk at the back of the cell, grabbed a piece of paper—purportedly a court order allowing Bruin to keep his dreadlocks—and turned around to hand it to Swank. *Id.* at 34:4–7; 115:18–19.

At this point, the parties' accounts diverge.

**1.** Bruin testified at trial that Swank "came in" his cell, "nudged" him, and then "hit [him] in [the] mouth … with a closed fist." *Id.* at 34:6–10. "As soon as my cell door opened, I walked in the cell and grabbed a piece of paper off the desk. As I turned around to come back and give Swank the paper before I was released from my shackles, Swank punched me." *Id.* at 49:20–24. Bruin began to swear at Swank and Gardner. *Id.* at 35:23–24.

The guards eventually removed his restraints and Bruin asked for a nurse. *Id.* at 36:24–25. According to Bruin, he sought medical attention for hours—not for treatment, but to document his injuries. *Id.* at 38:2–12. Finally, a nurse came by his cell during nightly pill call and assessed his injury. *Id.* at 37:25–38:2. He didn't testify to any serious or lingering physical injury, pain, or suffering caused by the punch. Though Bruin did say that it left him with (apparently self-diagnosed) PTSD and fear of prison guards, which he discussed with his case worker and counselor. *Id.* at 40:21–25. Bruin filed a grievance on October 27, complaining that the previous day "Officer Christopher Swank physically punched [him] in the mouth." Grievance Records (DN 246-2) at 6.

At trial, Bruin explained why he believes officers may have grown frustrated with his behavior, which he conceded was not always that of a model inmate: Bruin had been complaining, in a "heated" manner and with "some profanity," that the officers should stop trying to make him comb or cut his hair. *Id.* at 33:5–9. Based on his dreadlocks' religious significance, Bruin allegedly had "court orders" (not in evidence here) "telling me that I don't have to cut my hair, and I'm not going to comb my hair either." *Id.* at 33:12–14.

---

[2] The date and time when the incident occurred aren't clear from the record. Bruin's grievance, for example, states that it happened on October 26, as does the Grievance Committee's response. Grievance Records (DN 246-2) at 5–6. But Bruin's pretrial memorandum states that the incident occurred on October 27. DN 221 at 1. And the medical record Bruin submitted into evidence is dated October 27. DN 246–1 at 1. Ultimately, the exact date and time appear immaterial to Bruin's suit.

3

**2.** Swank offered a different report. He testified that he "had no concern with the paper" from the desk and was simply trying to "plac[e] [Bruin] in [his] cell" and remove his shackles. *Id.* at 116:7–14. But Bruin "turned around … trying to give [Swank] this piece of paper [Bruin] had" in his hand. *Id.* at 115:18–19. This worried Swank "because that's what gets us kicked the face." *Id.* at 115:20–116:4 (recounting that a different inmate had previously kicked him in the face while Swank removed shackles). So Swank "reached in the cell about four inches to grab [Bruin] by the arm to retrieve [Bruin] out of the cell, because at that point that was the second time [he] asked [Bruin] to turn around so [he] could get the shackles off." *Id.* at 116:11–14. Swank took Bruin out of the cell, "put [him] against the wall, and … called the supervisor." *Id.* at 116:19

**3.** Gardner also testified at trial. His story mostly echoed Swank's. He recalled that "[u]pon entering [the] cell, Officer Swank asked [Bruin] to turn around so he could take [Bruin's] shackles off." *Id.* at 88:25–89:1. But Bruin "went to [his] desk, got a piece of appear, and tried to show me and Swank a piece of paper." *Id.* at 89:2–3. Swank told Bruin "to please turn around so we could take your restraints off," but Bruin "refused." *Id.* at 89:5–6. So Gardner and Swank removed Bruin from his cell, "placed [him] against the wall," and "called for a supervisor." *Id.* at 89:7–9. Gardner emphasized that Swank "did not enter [the] cell" and "did not" punch Bruin. *Id.* at 90:4–7.[3]

**4.** Several other prison employees testified at trial. Swank called these witnesses—Warden White, Officer Potts, and Lieutenant Roberts—to testify about the altercation. All were involved in the investigation into Bruin's grievance over the incident, and all testified that they'd watched security-camera footage that showed Swank and Gardner returning Bruin to his cell that day.

But none of these witnesses directly saw the incident; they just watched the video afterwards.

---

[3] Officer Gardner may have had a handheld video camera with him. Trial Tr. (DN 255) at 89:14–18. Bruin's grievance states that Gardner had a "portable video camera in his pants pocket." Def. Ex. 2, Grievance Records at 6. And Bruin testified that he believed (but didn't know) Gardner was recording during the incident. Trial Tr. at 41:19–23 ("Q: As far as you know or remember, was this video camera rolling when you got hit? A: Yeah. It should be. Me having faith in the officers upholding their duties and doing what they're delegated to do, I would say that the camera was rolling."). Bruin also testified that he "requested that Bryan Potts"—the first officer who investigated his grievance—"look at the handheld video camera." *Id.* at 42:4–5. But Potts never did so; he only viewed footage from the stationary security camera. *Id.* at 100:23–101:1; Def.'s Ex. 2, Grievance Records at 6. Gardner, for his part, testified that sometimes officers carried cameras when escorting prisoners to their cells. Trial Tr. at 93:17–18. But he could not recall whether they did so for this particular escort. *Id.* at 93:15–16. And the Warden testified that "at the time, we did not make it a practice to use handheld video camera recordings of … two-man or one-man escorts." *Id.* at 55:6–8. So the record doesn't establish whether Gardner was carrying a handheld video camera, whether that camera captured the incident, and what happened to any footage if so.

4

Potts, then an internal-affairs officer at the Penitentiary, *see* Swank's Witness List (DN 245) at 2, investigated this grievance by "review[ing] video footage" and interviewing officers Swank and Gardner. Trial Tr. at 108:6; 100:8–11. He "did not find evidence to support" Bruin's claims. Def. Ex. 2, Grievance Records at 6

White, then serving as warden of the Penitentiary, testified that he harbored doubts about whether Potts (a relatively junior officer) performed "a thorough enough investigation." Trial Tr. at 61:16–17. So he ordered another (more senior) officer to re-investigate. *Id.* at 63:13–17.

That officer was Lieutenant Roberts, who also testified at trial. Like Potts, he investigated the grievance by reviewing the video footage and interviewing Swank and Gardner (but not Bruin). *Id.* at 126:3–4; 128:1–3. The footage, Roberts claimed, showed that Swank "grabbed ahold of [Bruin]" and "just walked him over to the wall." *Id.* at 126:16–18. Because of this, Roberts didn't see the need to interview Bruin. *Id.* at 128:5–7.

This repeat investigation apparently alleviated the Warden's concerns. He never explained why, however. The warden acknowledged on the stand that he also viewed the footage at some point during the Roberts investigation. *Id.* at 74:16. When he did so he concluded that Swank "did not enter [Bruin's] cell" and Swank's actions "didn't show any movements or any jerks or sudden motions by his hands striking Mr. Bruin." *Id.* at 78:1–5. The former warden (now state Commissioner of Juvenile Justice) ultimately found the grievance unsubstantiated. Grievance Records at 9.

**5.** The parties also introduced limited documentary evidence.[4] Bruin produced a medical note, dated October 27, which states that "inmate complained of lip pain

---

[4] During the final pretrial conference, Bruin complained that the Department hadn't produced its use-of-force policy in response to his discovery requests. FPTC Order (DN 251) at 2. Swank's lawyer (who's employed by and often represents the Department) responded that the policy was confidential, but "expressed no legal reason why this [policy] would not be discoverable." *Id.* So the Court ordered the Department to produce the policy. *Id.*

In response, the Department—through another lawyer—filed a motion for relief under Rule 60, contending that Bruin never requested the policy, whose disclosure would create a security threat. Motion for Relief (DN 252) at 2–4. The Court denied this motion without prejudice and ordered the Department to file the policy under seal for in-camera review. *See* DN 253.

At trial the Department of Corrections renewed its objection to producing its use-of-force policy. Trial Tr. at 6:22–7:1. The Department claimed that "historically [the policy] has never been disclosed to anyone outside the Department of Corrections." *Id.* at 6:24–7:1.

This position strains credulity. Employees of this Court, for example, happen to know, based on personal observation and without any specific investigation, that the Department has filed an unredacted copy of the policy on the public docket in another pending case. *See* Motion for Partial Summary Judgment (DN 79), Exhibit 6, *Moorman v. Belt, et al.*, 5:18-cv-

stating he was punched in the face, upper right lip was swollen." Plaintiff's Exhibit 1, Medical Note (DN 89-1).[5] He also testified that he tried, to no avail, to get someone on staff to take a picture of his face to memorialize his injuries. Trial Tr. at 38:8–12. Whatever the reason, the medical note is the only direct and nontestimonial evidence of Bruin's injury; no photos or video exist.

Swank introduced records related to Bruin's grievance. Defendant's Exhibit 2 (Grievance Records). These show that Bruin filed a grievance on October 27 to complain that "Swank physically punched [him] in the mouth." *Id.* at 6. Apparently based on the video footage, the Department rejected his grievance at each stage of the review process. *Id.* at 4, 9, 11.

## SPOLIATION

**1.** Whatever happened to this much-discussed footage? That question loomed over much of the trial. Many of the witnesses offered their recollections of what the security-camera footage revealed: the Warden, Potts, and Roberts all testified that it conclusively showed that Swank did not punch Bruin. *E.g.* Trial Tr. at 77:19–21 (Warden) ("[L]ooking at the video, … I determined that there was no opportunity for Mr. Swank to have struck the offender."); *id.* at 101:23–24 (Potts) ("[L]ooking at the video footage, it didn't show an assault…."); *id.* at 132:23–133:21 (Roberts) (recalling nothing "sudden or aggressive about when [he] saw Swank reach into the cell on the video"). But Swank did not introduce the footage itself into evidence—because the Department of Corrections allowed it to be destroyed.

According to a Department lawyer, this destruction was consistent with ordinary practice: the agency follows "no official video retention policy," but instead "save[s] things that we think are likely to result in litigation." Trial Tr. at 84:24–85:10. "[E]verything else," according to counsel, "is just automatically written over" because the Department "can't afford to keep" video footage. *Id.* at 85:7–10. At the time of this incident, the Warden explained, the Kentucky State Penitentiary "maintained … a camera system that would preserve data from 30 to 60 days as a normal routine." *Id.* at 66:9–10. "Anything beyond that would require a deliberate download of data and a preservation of data." *Id.* at 66:14–16. The Department of Corrections lacked the resources to retain all video evidence that *refuted* claims of

---

21 (W.D. Ky.). Because the policy was potentially relevant and had been disclosed in other cases, the Court ordered the Department to allow Bruin and his elbow counsel to review the policy—but has otherwise kept it under seal. *See* Trial Tr. at 149:3–5. Though the policy may be relevant, *see* FED. R. CIV. P. 26(b)(1), its violation would of course not establish a constitutional violation, *Hocket v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013). Regardless, Bruin didn't rely on the policy during his evidentiary presentation or argument.

[5] The Department did not object to the admissibility of this evidence on hearsay or any other grounds.

excessive force, he maintained, so it retained only the video that *substantiated* inmate claims. *Id.* at 76:4–16.

**2.** This raises a question of spoliation,[6] as both the Court and elbow counsel recognized. *Id.* at 134:9–18; 142:6–144:2. The parties—considering this unbriefed issue for the first time during trial—discussed whether to draw an adverse inference in response to the video's unavailability. *See id.* at 139:19–144:20. The Federal Rules of Evidence contain no spoliation rule. As explained by the en banc Sixth Circuit, agreeing with every other circuit, "the authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, 'from a court's inherent power to control the judicial process." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc) (quotation omitted). "[A]n adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (cleaned up). As covered at trial, a party seeking an adverse inference normally must show that (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) the evidence was "destroyed with a culpable state of mind"; and (3) "the destroyed evidence was relevant to the party's claim or defense." *Id.*

Under this familiar rule, the missing Bruin videotape looks like a textbook case for an adverse inference against the Department.

*First*, the Department unquestionably controlled the recording. Litigation (and therefore an obligation to preserve evidence[7]) was not merely anticipated but actually ongoing when the Department disposed of the video: the Department was actively adjudicating Bruin's grievance over this incident and its officers (in their official capacities[8]) were already in litigation with Bruin over related confrontations regarding his hair and Rastafarianism. In the prison context, courts have held that "a duty to preserve may attach … when an inmate files grievances about [an] incident." *E.g.*, *Bistrian v. Levi*, 448 F. Supp. 3d 454, 469 (E.D. Pa. 2020) (quotation omitted). "That is not to say that [a grievance] is always enough to put defendants on notice of potential litigation and trigger a duty to preserve." *See id.* "But such an event combined with other circumstances may often be enough that defendants

---

[6] "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quotation omitted).

[7] *See Beaven*, 622 F.3d at 553 (obligation to preserve arises "when a party should have known that the evidence may be relevant to future litigation" and the party had "notice" of such litigation); *see also* n.12 below.

[8] *See* First Screening Opinion (DN 48) at 1 ("Plaintiff brings this action against the following KSP officers and employees in their individual and official capacities…."); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] state official in his or her official capacity … is no different from a suit against the State itself.").

should reasonably anticipate litigation beginning soon after the incident itself." *Id.* Such circumstances are present here: the preexisting litigation between Bruin and prison officials, the overlapping religious objections at issue, and Bruin's apparent request that prison officials review video footage of the incident. *See* above at n.3 (referring to the handheld rather than stationary camera). By December 2016 (the latest time by which the video footage would have been automatically overwritten), Bruin had filed four amended complaints to add additional allegations and claims that arose after July 2016. *See* DNs 18, 23, 26, 34. From these filings, the Department should have reasonably anticipated—before the video footage was overwritten—that litigation over this latest confrontation between Bruin and prison officials would result in litigation. *E.g.*, *Manning v. Erdos*, No. 1:22-cv-371, 2024 WL 2882647, at *7 (S.D. Ohio June 7, 2024) ("Plaintiff already had civil litigation pending by the time of the alleged assault").

*Second*, relevance is obvious. The Department affirmatively used the recording in its investigation and adjudication, with officials relying on the videotape to exonerate their colleagues. The Department and Warden readily agreed that the videotape supplied the best evidence of what happened on the cell block. They also agreed that the tape—had it remained available—could've resolved this dispute years ago. *E.g.* Trial Tr. at 77:6–7 (Warden: "In hindsight, I really wish that we had [saved the footage].")

*Third*, the "culpable state of mind" is nearly as clear. The videotape was destroyed under an (apparently unwritten) policy. The Department unilaterally determined whether the video "substantiated" an inmate's claim, *see* Trial Tr. at 76:4, rather than whether it was "relevant" to the claim, *contra Beaven*, 622 F.3d at 553. Department officials apparently never made the video available to Bruin, despite relying on it extensively in the grievance and litigation processes. They again relied on the videotape when testifying in court in defense of Bruin's claim against their colleague.

Under the common-law spoliation standard, therefore, a court could punish the loss by instructing a jury or concluding itself that the destroyed evidence would've been favorable to the opposing party. *See, e.g.*, *DeMeo v. Kean*, 754 F. Supp. 2d 435, 448–50 (N.D.N.Y. 2010) (imposing adverse inference because defendant failed to preserve relevant video viewed multiple times before its loss); *Ross v. Home Depot USA Inc.*, No. 2:12-cv-743, 2014 WL 2805094, at *6 (S.D. Ohio June 20, 2014) (issuing permissive adverse-inference instruction because defendants failed to preserve footage that witnesses testified about at trial). Here, that would mean presuming the video corroborated Bruin's account of Swank punching him.

**3.** Overlooked by defense counsel's common-law arguments is a potential complicating factor: video footage such as that at issue here likely qualifies as Electronically Stored Information, or ESI, whose spoliation is governed by a specific provision in the Federal Rules of Civil Procedure.

In 2015 the Rules Committee codified and modified the common-law spoliation rule with respect to ESI in particular.  Under Rule 37(e), a court may sanction a party "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery" and the opposing party suffers prejudice from the loss.[9]  This Rule "forecloses reliance on inherent authority … to determine when certain [sanction] measures should be used."  2015 Advisory Committee Notes to Rule 37(e).

"Video is"—or at least can be—"a form of ESI."  *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 618 (N.D. Ill. 2022).  While analog videotape may not fall under the scope of Rule 37, video footage stored on a server almost certainly does. *See Bistrian*, 448 F. Supp. 3d at 467 ("While there is no definitive evidence as to whether the … surveillance footage was digital or analog … it appears almost certain that it was digital, so Rule 37(e) applies.").  Although the parties didn't specifically agree on this point, all the record evidence indicates that the video was electronically stored information.  *See, e.g.*, Trial Tr. at 80:19–20 (explaining that, before automatic overwriting, the video would have been "in the server").

That means Rule 37(e) applies here.  And this provision limits when an adverse inference is warranted.  In short, if the failure to preserve ESI results from a party's failure to take reasonable steps to preserve it, a court may "order measures no greater than necessary to cure the prejudice."  FED. R. CIV. P. 37(e)(1).  But it may only "presume that the lost information was unfavorable to the party" if "the party acted with the intent to deprive another party of the information's use in litigation."  *Id.* at 37(e)(2).

Faced with a situation crying out for preservation, the Department did nothing.  The Warden testified that "the video was never taken out of the server

---

[9] Rule 37(e), in its entirety, provides:

> (e)  FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

9

cycle." Trial Tr. 80:20–21. This cannot be blamed on a standard policy, either: as noted above, the Department "has no official video retention policy." *Id.* at 84:24–25. As other Courts have held, doing nothing is not reasonable. *E.g., Bistrian*, 448 F. Supp. 3d at 475; *Johns v. Gwinn*, 503 F. Supp. 3d 452, 468–70 (W.D. Va. 2020).

That is particularly true here since the Department allowed the footage to be deleted *while its investigation remained ongoing.* An investigation, recall, that the Warden had already restarted once because of concerns regarding its thoroughness. Trial Tr. at 61:14–17. Based on the trial testimony, the video would've been deleted under the informal 30-to-60 day preservation cycle in December 2016—*before* the Department had resolved Bruin's grievance. The Warden did not issue a memorandum rejecting the grievance until March 7, 2017, and the Commissioner of Corrections did not reject Bruin's grievance until March 15. Def.'s Ex. 2, Grievance Records at 7, 9, 11. So by the time the grievance reached the Warden and the Commissioner, the footage was apparently gone. Yet the Warden relied on that footage to reject Bruin's grievance—and (along with his colleagues) continued to rely on it from the stand in this trial, testifying about a video that neither the Plaintiff nor the finder of fact would ever see.

Swank doesn't cite Rule 37(e). But his response echoes the Rule's focus on the litigating "part[ies]" without mentioning nonparty custodians: "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a *party* failed to take reasonable steps to preserve it…." Fed. R. Civ. P. 37(e) (emphasis added). Without appealing to the text, Swank nevertheless distinguishes himself (the party) from the Department (the custodian). "[W]hatever poor decision-making or policy" led to the destruction of the footage, defense counsel maintains, "it's DOC's and not Mr. Swank's" fault. Trial Tr. at 139:10–11. As a matter of fairness, if nothing else, why should the Department's own sin be visited upon its employee?

As a textual matter, this response ignores that the Department *was* a party in this case in every meaningful way. Bruin sued the Warden (in his official capacity) alongside many other correctional officers in July 2016. *See* DN 1-4 at 2–3. In November 2016, Bruin filed a pro se motion to produce video surveillance. DN 36 at 2 ("It's clear the defendants or counse[l] wan[t] this footage to remain undiscovered Why? is a question for the Courts!").[10] Assuming the Department witnesses are

---

[10] The Department responded that production of the video would be "premature" because the Court had yet to conduct a § 1915A screening review of this *pro se* prisoner complaint. DN 43 at 1; *see also* DN 96 at 2 (Chief Judge's order denying request for production "at this time" as premature). The response mentioned nothing about destruction or preservation. Although it's unclear whether this motion and a subsequent one filed in August 2017 (DN 93) seek footage of the October 2016 incident in particular, plainly the Departmental Defendants were or should've been on notice of the request for the video—and therefore the need to preserve it—through their counsel. How counsel could nevertheless allow video evidence to be destroyed in the normal course, despite a demand filed in federal court, is baffling.

correct regarding their timeline, they would've destroyed the video at some point within a month of this request. In December 2016, the latest time estimated for the destruction, the Warden remained a defendant subject to Rule 37(e) under any plausible interpretation. Furthermore, the Department was a "party" to Bruin's grievance. And even if the Department has by now been dismissed as a party, it continues to represent Swank. Any gap between Swank and the Department is slim indeed.

The Sixth Circuit doesn't appear to have confronted a similar situation. Nor has it addressed the version of this question framed more favorably to Swank: whether a party can be held responsible for a non-party's destruction of electronically stored information. Even in that posture, several courts have imputed a non-party's spoliation of evidence to a defendant when those entities have a particularly close relationship.[11] And at least one other court has held that a prison guard may be held responsible under Rule 37(e) for a Department of Correction's destruction of video footage, given the entities "special relationship" and the need to "prevent injustice." *Johns*, 503 F. Supp. 3d at 465 ("VDOC had a duty to preserve for purposes of Rule 37(e) and …, if this duty was triggered and spoliation is found, sanctions may be imposed against Defendant to remedy harm to Plaintiff caused by any failings by VDOC.").

The caselaw isn't entirely clear whether imputing spoliation reflects a relatively broad interpretation of the term "party" under Rule 37 or else an exercise of inherent evidentiary authority that remains notwithstanding the addition of Rule 37(e). *See Caslep A/S v. Dabral*, 84 F.4th 304, 310–11 (5th Cir. 2023) (highlighting the distinction between inherent power and Rule 37(e)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.").

Regardless of the authority relied on by these courts, their decisions appear entirely consistent with Bruin's position here: Swank and the Department of Corrections have the kind of close relationship present when courts have imputed a third party's spoliation to a defendant. The Department has "a uniquely intertwined relationship with Defendant." *Johns*, 503 F. Supp. 3d at 463. It "employs Defendant,

---

[11] *See, e.g.*, *Caslep A/S v. Dabral*, 84 F.4th 304, 313–14 (5th Cir. 2023) (affirming Rule 37(e) sanctions against nonparties who destroyed relevant evidence when defendant was "100% owner" of the company that employed the nonparties and court could not "separate [defendant's] existence as a party from his companies' action in this litigation" even though defendant argued that "there's no evidence he destroyed any software"); *Ramos v. Swatzell*, No. 12-cv-1089, 2017 WL 2857523, at *11 n.3 (C.D. Cal. June 5, 2017) ("CIW and CDCR are not parties to this action; however, as discussed above, their discovery violations may be imputed to defendants here" under Rule 37.), *R&R adopted*, 2017 WL 2841695; *cf. Wall v. Rasnick*, 42 F.4th 214, 222 n.7 (4th Cir. 2022) ("whether to impute to named parties a failure by nonparties to preserve evidence is especially fraught in prisoners' rights cases") (remanding for consideration of imputation).

11

it trains Defendant, and … it represents Defendant in this suit." *Id.* Because it represents Swank (as it has other Department employees, including the Warden, in this litigation), it has "control[led] all evidence introduced in his favor, and through the grievance process, [it] was responsible for resolving Plaintiff's dispute against Defendant internally before Plaintiff filed the suit." *Id.* It also appears that the Department has the ability—subject to various interdepartmental checks that defense counsel has alluded to throughout this case—to settle this case on Swank's behalf. *See* Trial Tr. at 148:18–149:2. A contrary rule would create hugely perverse incentives for closely aligned entities to circumvent longstanding and well-founded rules against spoliation. *See Johns*, 503 F. Supp. 3d at 464 ("[R]efusal to recognize a special relationship would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits."). These facts, it would seem, call for the Court to impute the Department's spoliation to Swank.[12]

Irrespective of whether the Department counts as a "party" here, the Court needn't rest its decision on that legal basis alone. Setting aside the witness testimony regarding the missing video would be an appropriate legal "cure" of the spoliation if the Rule applies by its own terms or as a matter of inherent authority. But the same cure makes sense as a factual matter. In its role as factfinder, the Court has grave doubts about reliance on an opportunistically missing videotape. Therefore it accords minimal if any weight to the officers' testimony regarding the video. *See Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir. 2008) ("[I]n a bench trial the court must decide how much weight to give to a witness' testimony…." (quotation omitted)). This doesn't represent a finding regarding the officers' credibility. Much of Swank's case is built on testimony that the missing video footage exonerates him. Allowing him to benefit from this testimony—without Bruin or the factfinder being able to test it on review or cross-examination—would

---

[12]Were this any other type of evidence—or even an old-fashioned video cassette instead of digital video—the Court would have the ability to impose an adverse inference sanction. *E.g.*, *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 457–58 (6th Cir. 2012) (affirming imposition of adverse inference on a plaintiff who negligently allowed third party to destroy physical evidence). But the Rules Committee has decided to privilege this one category of evidence—electronically stored information—above all others. Its stated rationale was to prevent litigants from "expend[ing] excessive effort and money on preservation in order to avoid the risk of severe sanctions if a court finds they did not do enough." 2015 Advisory Committee Notes to Rule 37(e). But in many ways ESI is easier and cheaper to store than other forms of evidence. And as this case demonstrates, the Rules Committee's decision to *categorically* confine district courts' discretion may sweep far more broadly and act more bluntly than the Committee may have anticipated. Specific intent "to deprive another party of the information's use in the litigation," FED. R. CIV. P. 37(e)(2), is a "high standard of mental culpability"—one that arguably "deprives judges of an important tool for combating unfairness in many cases involving the loss of evidence." Shira A. Scheindlin & Natalie M. Orr, *The Adverse Inference Instruction After Revised Rule 37(E): An Evidence-Based Proposal*, 83 FORDHAM L. REV. 1299, 1301 (2014).

greatly exacerbate the prejudice of the lost video. But their testimony regarding the video is inextricably intertwined with the contents of the video itself—video which the Department allowed to be overwritten, despite requests for production and an obvious need for preservation, so the factfinder cannot see it. The Court thus sets aside the derivative testimony from the Warden, Potts, and Roberts about what the video purportedly showed and will not account for that evidence in its factual findings below.[13]

## FINDINGS OF FACT

That leaves the eyewitness testimony of Bruin, Swank, and Gardner; the spare documentary evidence they offered (grievance and medical forms); and the limited testimony of the Warden, Potts, and Roberts that didn't involve the video footage. None of the documents are terribly illuminating, none of the witnesses on either side appeared less than credible, cross-examination revealed few if any significant holes in either side's story, and those stories are fundamentally irreconcilable. This record, however imperfect, must resolve the single factual question in dispute: whether Swank punched Bruin.

Bruin credibly testified that Swank punched him: "Swank came in my cell, hit me in my mouth with a closed fist, while Officer Neal Gardner stood outside the cell…." Trial Tr. at 34:9–10. He explained, in detail, what happened before, during, and after the incident. His testimony about picking up a note was at least consistent with Swank's and Gardner's accounts that Bruin picked up paper from his desk. Trial Tr. at 115:18–19 (Swank), 89:1–3 (Gardner). The medical note he produced provides some corroboration for his account, but not much: it contemporaneously records Bruin's assertion that he was "punched in the face" and suffered a swollen lip. Plaintiff's Ex. 1, Medical Note. It shows Bruin's account has apparently been consistent since 2016. But it says nothing about *who* punched Bruin; it does not establish that Bruin was in fact punched; and it offers no third-party corroboration of Bruin's self-interested accusation of Swank.

---

[13] The practical effect of this law/fact distinction is minimal. Whether as a potential "cure" in response to a finding that Swank violated Rule 37(e) (a legal conclusion) or the decision to accord minimal weight to the officers' testimony regarding the video (a factual conclusion), the effect is to whittle the available evidence down to the scant documentary evidence and individuals' eyewitness testimony. The Court's discretion—as factfinder in a bench trial—to accord minimal weight to particular witness testimony, is not debatable. *See, e.g.*, *MVT Services, LLC v. Great West Casualty Co.*, 118 F.4th 1274, 1281 (10th Cir. 2024) ("The district court has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from facts established, and resolving conflicts in the evidence.") (quotation omitted); *cf. RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals*, 609 F. App'x 731, 742 (4th Cir. 2015) ("[A] district court's decision on how much weight to give testimony at a bench trial is one that we afford great deference.").

Swank's testimony was no less credible or sensible. He offered slightly more detail in explaining (in response to Bruin's cross examination[14]) that he did not throw a punch: "I reached in the cell about four inches to grab you by the arm to retrieve you out of the cell, because at that point that was the second time I asked you to turn around so I could get the shackles off you." Trial Tr. at 116:11–14.

Gardner corroborated Swank's testimony. Gardner testified that Swank told Bruin that the hair policy he was complaining about "was not anything that we had anything to do with, [s]o please turn around so we could take your restraints off." *Id.* at 89:4–6. Bruin refused, so Swank and Gardner "removed [him] from [his] cell, placed [him] against the wall … and … called for a supervisor." *Id.* at 89:7–9

Despite seeing and hearing extended sworn testimony from all the eyewitnesses—in some instances in response to direct questioning from the other eyewitness—the Court lacks an articulable basis for crediting one account over the other. The witnesses answered candidly, clearly, and without hesitation. None tripped over his story, had to double back, or got caught in a lie. Despite weighing and re-weighing the competing testimony as carefully as possible, each of the two accounts remains equally plausible.

The remaining evidence, moreover, does little to tip the scales in either direction. The medical notes regarding Bruin's injury are equally consistent with a punch from Swank as they are with any number of other mechanisms of injury. Whatever harm Bruin suffered wasn't so great that it must've come from an attack or assault; in fact the harm (and any resulting damages) appears fairly minimal—even on Bruin's own account.

The only facts that the Court may confidently find are these (in many respects undisputed). Bruin had an adverse relationship with the Department and at least some of its correctional officers in the autumn of 2016. Swank and Gardner escorted Bruin to his cell on October 26 or 27. Rather than immediately allowing the guards to unshackle his feet, Bruin instead walked into the cell to retrieve a piece of paper that he wanted to show the guards. Swank laid his hands on Bruin—though whether he punched him or merely moved him against the wall is unclear. Swank and Gardner then left the area, Trial Tr. at 36:21, and a different set of guards removed the ankle shackles and handcuffs 15 to 20 minutes later, apparently without further incident. Trial Tr. at 36:21–37:11. Bruin contacted medical staff and told them about his cut lip, which he memorialized in a note, and then filed a grievance, which led to an internal affairs investigation that cleared Swank.

## CONCLUSIONS OF LAW

How to resolve these irreconcilable accounts from equally credible witnesses? That's what the burden of proof is for. And the plaintiff bears the burden in a true coin-flip situation like this one. Lacking any non-arbitrary basis to credit one side

---

[14] Swank, like all other witnesses, testified in response to quite capable questioning from Bruin—proceeding *pro se*—with limited assistance from elbow counsel.

14

over the other, the Court can conclude only that Bruin has not met his burden of proof.

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." *Velasquez v. United States Postal Service*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016). "To establish a fact by a preponderance of the evidence means to prove that *the fact is more likely true than not true.*" *Id.* (emphasis added). Though Bruin testified credibly, he has not established that Swank more likely than not punched him. That is due to the minimal corroboration for Bruin's testimony, Swank's equally credible testimony that he did not punch Bruin, and Gardner's corroboration of Swank's account.

This conclusion flows directly from the factual findings above (placing the proof in equipoise) and legal burden of proof. *See Blount v. Davis*, No. 7:11-cv-91, 2013 WL 2636261, at *6 (W.D. Va. June 12, 2013) ("Altogether, in weighing the parties' conflicting accounts, the court believes the evidence in support of each to be in equipoise."). "If the evidence is closely balanced, then common sense indicates there is a reasonable possibility that who bears the burden of proof will determine the outcome." *United States ex rel. Bilyew v. Franzen*, 686 F.2d 1238, 1248 (7th Cir. 1982). Indeed, the burden of proof exists precisely for cases such as this one, with evidence so evenly matched: "If the evidence that the parties present balances out perfectly, the party bearing the burden loses." *Cigaran v. Heston*, 159 F.3d 355, 357 (8th Cir. 1998). So as a matter of law the Court cannot conclude that Swank punched Bruin: "Because the plaintiff carries the burden of proving each of the elements of his claim by a preponderance of the evidence, the court is compelled to rule in favor of the defendan[t]." *Blount*, 2013 WL 2636261, at *6.

And absent a punch, Bruin offers no other basis to conclude that Swank violated his Eighth Amendment right to be free of cruel and unusual punishment. That provision, as interpreted by the Supreme Court, prohibits "cruel and unusual punishments" from being "inflicted" upon prisoners, protecting them from "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). This right "has both objective and subjective components." *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023). "Objectively, harm to a prisoner must rise to a sufficiently serious level…" *Id.* (quotation marks omitted). Subjectively, in the use-of-force context, a prisoner must show that officers used force "maliciously and sadistically to cause harm" to establish the subjective component. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quotation omitted).

Bruin can establish neither the objective nor subjective component of an Eighth Amendment excessive-force claim without the punch. As for the objective component, the force that Swank did use—grabbing Bruin's arm and pulling him out of the cell—is not "sufficiently serious." *See Johnson*, 79 F.4th at 615.[15] Such force

---

[15] If Swank had punched Bruin, the objective element would present a close call. The Sixth Circuit recently declined to decide whether the objective component of an Eighth

15

is "*de minimis*" under Sixth Circuit precedent: "an officer used *de minimis* force when he grabbed a prisoner's neck and threatened him without causing physical injury." *Johnson*, 79 F.4th at 617 (cleaned up) (citing *Scott v. Churchill*, No. 97-2061, 2000 WL 519148, at *3 (6th Cir. Apr. 6, 2000) (order)).  As for the subjective component, nothing in the record—except perhaps for Bruin's own suggestions that he at times wasn't a "model citizen"—suggests that grabbing Bruin and pulling him out of his cell was anything more than "a good-faith effort to maintain or restore discipline." *Wilkins*, 559 U.S. at 40 (quotation omitted).

Bruin therefore has not established by a preponderance of the evidence that he suffered constitutionally excessive force when Swank and Gardner returned him to his cell.

## ORDER

The Court enters judgment in favor of Swank on Bruin's Eighth Amendment claim.

Benjamin Beaton, District Judge
United States District Court

January 24, 2025

---

Amendment excessive-force claim was met where an officer "grabbed [a prisoner's] neck, pushed him against the wall, and took him to the ground to be handcuffed," and the prisoner suffered "discomfort in his throat." *Johnson*, 79 F.4th at 612, 614.  It explained that this force "falls somewhere in between [its] two precedential poles" but "may well have" satisfied the objective component, if only just. *Id.* at 618.  It avoided this issue by holding that the officer did not act with a culpable state of mind. *Id.* at 618–20.

16